FEINBERG, Circuit Judge:
 

 Eliot H. Weisman and Salvatore J. Can-natella appeal from judgments of conviction entered in the United States District
 
 *1120
 
 Court for the Southern District of New York after an eight-week jury trial before Judge Robert W. Sweet. Weisman, Canna-tella and eight other co-defendants were indicted in June 1978 for alleged criminal offenses arising out of the creation, operation and bankruptcy of the Westchester Premier Theatre (the Theatre) in Tarry-town, New York. Weisman was convicted of one count of operating the Theatre through a pattern of racketeering activity in violation of 18 U.S.C. §§ 1962(c) and 2, nine counts of fraud in the sale of securities in violation of 15 U.S.C. §§ 77q(a) and 77x and 18 U.S.C. § 2, nine counts of bankruptcy fraud in violation of 18 U.S.C. §§ 152 and 2, one count each of conspiracy to commit securities fraud and bankruptcy fraud in violation of 18 U.S.C. § 371, and one count of endeavoring to obstruct a grand jury investigation in violation of 18 U.S.C. §§ 1503 and 2. Cannatella was convicted of the same counts of bankruptcy fraud and conspiracy to commit bankruptcy fraud.
 
 [1]
 
 In this appeal, Weisman and Cannatella raise numerous challenges to the conduct of the trial and the verdict, the most significant of which relate to Weisman’s conviction under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 et seq. For reasons set forth below, we affirm the judgments of conviction.
 

 I. The Facts
 

 Appellant Weisman does not argue that the evidence at trial was insufficient to convict him; while appellant Cannatella does make such a claim, it is without merit as will be seen below in Part III B of this opinion. The following is a brief summary of the charges in the government’s indictment, which were subsequently shown to be justified by the evidence at trial and by guilty pleas of various defendants. The Theatre, from its inception until its collapse, was operated through a wide ranging pattern of fraud. This pattern emerged in 1973, when Weisman, along with his partners and eventual co-defendants Gregory J. DePalma and Richard Fusco, sought through a fraudulent public offering of common stock to raise over two million dollars for construction of the Theatre. Weisman and his co-defendants filed with the Securities and Exchange Commission a prospectus that contained false and misleading statements and that failed to disclose material facts, including DePalma’s and Fusco’s role in the project and their beneficial ownership of a large portion of the Theatre’s stock. Also, to insure purchase of the necessary minimum number of shares at the public offering, Weisman, De-Palma and Fusco, with the assistance of co-defendants Murad Nersesian, Leonard Horwitz and Laurence I. Goodman, made secret arrangements through which various individuals agreed to purchase stock in the Theatre in return for promises of eventual cash payoffs, transfers of portions of Weis-man’s interest in the Theatre, and other forms of inducement or remuneration.
 

 Due to these efforts, the public offering of the Theatre’s stock was successful. The newly constructed Theatre opened in March 1975, at which time Weisman and his confederates systematically began to skim and convert to their own use moneys received by the Theatre from ticket sales and various concessions. Portions of these funds were also used to repay the various secret debts incurred prior to the stock offering. During this period, the Theatre received a substantial amount in loans from Hugh Johnson & Company. These loans were arranged by the company’s president, appellant Cannatella, who assumed a management role in the Theatre along with Weis-man, DePalma and Fusco.
 

 The skimming operation forced the Thea-tre in December 1976 to file a petition under Chapter XI of the Bankruptcy Act. The Theatre was adjudged a “debtor in possession” and allowed to continue operations, but all expenditures, other than salaries and operating expenses, were subject to
 
 *1121
 
 prior approval by the bankruptcy court. Nonetheless, Weisman, DePalma and Fusco, now joined by Cannatella, continued secretly to skim the Theatre’s receipts. Portions of the diverted revenues were unlawfully paid to various co-defendants, including Thomas Marson and Anthony Gaggi.
 

 In May 1977, a federal grand jury began investigating the operations of the Theatre. At this time, Weisman and Horwitz attempted to persuade various prospective grand jury witnesses not to disclose the defendants’ fraudulent transactions. These efforts to sidetrack the grand jury were unavailing, however, and a multiple count indictment was returned in June 1978.
 

 Trial commenced in October 1978 as to nine defendants; Marson’s trial was severed for health reasons. In December 1978, Judge Sweet granted Gaggi’s motion for acquittal, and in January 1979, declared a mistrial as to the remaining defendants when the jury was unable to reach a verdict. Subsequently, defendants Fusco, De-Palma and Marson pled guilty to various charges. The new trial for defendants Weisman, Cannatella, Nersesian and Hor-witz began in March 1979. As in the first trial, the bulk of the government’s case consisted of testimony of several participants in the various schemes and numerous tape recordings obtained by the government through electronic surveillance and by a body recorder worn by government informant Norman Brodsky. In May 1979, the jury acquitted Nersesian but found Weis-man, Horwitz and Cannatella guilty on all counts. Judge Sweet subsequently granted Horwitz’s motion for a new trial, but denied similar motions by Weisman and Cannatel-la. On this appeal, we treat the major arguments raised by Weisman and Canna-tella in separate sections. Our reviewing task is made easier by the various thorough opinions of the district judge, to which we refer below.
 

 II. Weisman
 

 A.
 
 The RICO Count.
 

 Weisman directs his most pointed attack against his conviction for violating the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 et seq., commonly known as RICO. For convenience, we have reproduced the relevant sections of RICO as Appendix A. The RICO count charged that Weisman, along with DePal-ma and Fusco, violated § 1962(c) by conducting the affairs of the Theatre through a “pattern of racketeering activity” that included the various predicate acts of securities fraud and bankruptcy fraud alleged elsewhere in the indictment. Weisman contends that his conviction on this count was invalid in three respects.
 

 Weisman first argues that Judge Sweet’s charge on the relationship between the various predicate acts of racketeering necessary to establish a violation of section 1962(c) was incorrect. That section prohibits the operation of any “enterprise” engaged in interstate or foreign commerce through a “pattern of racketeering activity.” A “pattern of racketeering activity” is defined by section 1961(5) to require the commission of at least two “acts of racketeering” within a ten-year period, and section 1961(1)(D) specifies both fraud in the sale of securities and bankruptcy fraud as acts of racketeering. Weisman, however, unsuccessfully requested that the jury be charged that even if it found that he had committed two or more predicate acts of racketeering within a ten-year period, an unlawful “pattern of racketeering activity” would not be established unless the predicate acts were also found to be “related” to each other through a “common scheme, plan or motive so as to constitute a pattern of activity.”
 

 Weisman renews this claim on appeal, arguing that a requirement of “relatedness” between predicate acts is implicit in the meaning of the word “pattern” and should have been explained further, as he requested. Appellant further argues that such an interpretation is necessary in order to prevent the application of RICO to instances of sporadic and unrelated criminal activity that Congress clearly did not intend
 
 *1122
 
 the statute to cover.
 
 [2]
 
 Finally, appellant relies heavily on the analysis of the district court in
 
 United States v. Stofsky,
 
 409 F.Supp. 609 (S.D.N.Y.1973), aff’d on other grounds, 527 F.2d 237 (2d Cir. 1975), cert. denied, 429 U.S. 819, 97 S.Ct. 65, 50 L.Ed.2d 80 (1976). In
 
 Stofsky,
 
 the court noted that the language of RICO did not embody any express requirement of relatedness between predicate acts. The court nonetheless concluded, as appellant argues here, that the word “pattern” should be construed to require that the predicate acts of racketeering be “connected with each other by some common scheme, plan or motive” in order to prevent the application of the statute to isolated and sporadic criminal acts. 409 F.Supp. at 614. The court found further support for its interpretation of “pattern” in the language of 18 U.S.C. § 3575, the provision of the criminal code dealing with “Dangerous Special Offenders.” Section 3575 characterizes as “special offenders” those who, inter alia, commit a felony as part of a “pattern” of criminal conduct, and subsection (e) specifies that a “pattern of criminal conduct” exists when “criminal acts . . . have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.” Since RICO and section 3575 were both enacted as part of the Organized Crime Control Act of 1970, the
 
 Stofsky
 
 court concluded that the interpretation of the word “pattern” under both provisions should be similar.
 

 While these arguments are far from frivolous, we affirm Judge Sweet’s refusal to give the requested charge, substantially for the reasons set forth in his ruling on appellant’s challenge to the indictment before the first trial, which raised the same arguments.
 
 United States v. DePalma,
 
 461 F.Supp. 778, 781-85 (S.D.N.Y.1978). As noted in
 
 Stofsky,
 
 supra, the statutory language does not expressly require that the predicate acts of racketeering be specifically “related” to each other and we find no affirmative evidence in the legislative history from which we should infer such a requirement.
 
 [3]
 
 Furthermore, the broad spectrum of predicate acts of racketeering enumerated in section 1961(1) belies any intent on the part of Congress to require that such predicate acts of racketeering must possess a unitary character. While we agree with appellant Weisman that RICO was not intended to apply to sporadic and unrelated criminal acts, see S.Rep.No.91-617, 91st Cong., 1st Sess., pp. 122/158 (1970), we find that the statute was generally designed to avoid such an application. Most importantly, the predicate acts constituting a “pattern of racketeering activity” must all be done in the conduct of the affairs of an “enterprise.” 18 U.S.C. § 1962(c). Thus, the enterprise itself supplies a significant unifying link between the various predicate acts specified in section 1961(1) that may constitute a “pattern of racketeering activity.” See
 
 United States v. Elliott,
 
 571 F.2d 880, 899 & n.23 (5th Cir. 1978). In addition, the statute requires that the predicate acts be temporally related in that they must occur within a ten-year period. Moreover, we do not believe that the extensive defini
 
 *1123
 
 tion of “pattern” in section 3575 requires a district court to give a parallel charge concerning the meaning of “pattern” under RICO. Indeed, the fact that the two sections were enacted simultaneously yet embody different definitions of “pattern” would seem to indicate that Congress intentionally chose to use the term differently in different contexts.
 

 It may well be, as appellant argues, that the statutory requirements that predicate acts of racketeering must occur in the conduct of a single enterprise within a ten-year period in order to constitute a “pattern of racketeering activity” are by themselves inadequate to bar some hypothetical prosecutions under RICO that are clearly beyond the intended scope of the statute. See note 2 supra. In
 
 United States
 
 v.
 
 Huber,
 
 603 F.2d 387 (2d Cir. 1979), cert. denied, - U.S. -, 100 S.Ct. 1043, 62 L.Ed.2d 770 (1980), we noted that “the potentially broad reach of RICO poses a danger of abuse where a prosecutor attempts to apply the statute to situations for which it was not primarily intended” and we went on to caution strongly against “undue prosecutorial zeal in invoking RICO.” Id. at 395-96. We reiterate this warning, but are content to rule on actual, as opposed to hypothetical, applications of the statute, and we find that the RICO indictment in the present case was clearly appropriate. The evidence in the record reveals that the affairs of the Theatre, from its inception until its eventual collapse and bankruptcy, were conducted through a variety of racketeering activities enumerated in the indictment. Indeed, a more appropriate application of the statute would be difficult to imagine.
 
 [4]
 
 Accordingly, we find no error in the court’s refusal to adopt Weisman’s extended definition of “pattern” in charging the jury.
 

 Weisman also objects to the RICO conviction on the ground that the district court incorrectly charged the jury that the two conspiracy counts alleged in the indictment could constitute the predicate acts of racketeering necessary to establish a “pattern of racketeering activity” under section 1962(c). In support, appellant notes that violations of 18 U.S.C. § 371, the conspiracy statute, are not listed as predicate acts of racketeering under section 1961. Appellant also infers a specific congressional intent to exclude conspiracy as a predicate act from the fact that original versions of the bill that ultimately became RICO did include conspiracy as a predicate act, but the statute as enacted did not. Finally, appellant suggests that the inclusion of conspiracy as a predicate act would again raise the specter of an unintended hypothetical application of RICO; specifically, appellant argues that commission of a single substantive offense enumerated in section 1961 could nonetheless result in a RICO violation if conspiracy to commit that offense were also charged as a predicate act of racketeering. Such a prosecution, appellant contends, would be directly contrary to Congress’s intent to restrict the application of RICO to situations in which two or more separate predicate acts of racketeering are committed.
 

 While these arguments are not without force, we think that conspiracy can properly be charged as a predicate act of racketeering under RICO, at least when it involves any of the substantive offenses listed in section 1961(1)(D). That provision states that “ ‘[racketeering activity’ means
 
 *1124
 
 .
 
 any offense involving
 
 [bankruptcy] fraud . . fraud in the sale of securities, or the felonious manufacture, importation, concealment, buying, selling, or otherwise dealing in narcotic or other dangerous drugs,
 
 punishable under any law of the United States.”
 
 (Emphasis supplied). This language is certainly broad enough on its face to include conspiracies involving securities and bankruptcy fraud and drug related offenses. The deletion of conspiracy from earlier drafts of RICO does not undermine this conclusion. In those drafts, the conspiracies chargeable as predicate acts could relate to a broad number of offenses now listed in subsections (A) to (C) of section 1961. While this specific reference to conspiracy was deleted from the final version of RICO, the expansive language quoted above was retained in a sepa- . rate section — section 1961(1)(D). Thus, the alterations of section 1961(1) are most logically interpreted as an attempt to restrict the conspiracies chargeable as predicate offenses to those involving offenses listed in subsection (D). This conclusion is bolstered by the fact that subsections (B) and (C), which list most of the other predicate acts chargeable under RICO, conspicuously lack the broad “any offense involving” language of subsection (D) and, in fact, require that the act be indictable under specifically enumerated sections of the criminal code. Finally, the present indictment is not rendered invalid simply because some hypothetical prosecutions under the statute as presently interpreted would fall beyond the pale of intended application.
 

 Even if our conclusion that the two conspiracy counts could be charged as predicate acts of racketeering is incorrect, Weisman’s conviction under the RICO count is nonetheless valid. In addition to convicting Weisman on the conspiracy counts, the jury also found him guilty of nine counts of bankruptcy fraud, all of which were also charged as predicate acts of racketeering under the RICO count, and nine counts of fraud in the sale of securities, which the district court also charged could constitute a single predicate act of racketeering under the RICO count.
 
 [5]
 
 Thus, even excluding the conspiracy counts as predicate acts, the convictions for securities fraud and bankruptcy fraud could also constitute ten separate predicate acts of racketeering, any two of which would be sufficient to sustain the conviction on the RICO count. This assumes, of course, that the jury also found that these substantive offenses occurred in the conduct of an “enterprise” engaged in interstate or foreign commerce, as required by section 1962(c). While in some situations it may be doubtful that this assumption is established as a matter of law, in the present case the jury could not have rationally concluded that the conspiracies to commit bankruptcy and securities fraud occurred in the conduct of the Theatre’s affairs without also finding that the substantive offenses carried out in the course of the conspiracies also took place in the conduct of the Theatre’s affairs. Thus, even if the conspiracy counts were excluded, the jury verdict conclusively established a RICO violation and therefore any error in the inclusion of these counts in the RICO charge was harmless. For this reason, the decision in
 
 United States v. Brown,
 
 583 F.2d 659, 669 (3d Cir. 1978), cert. denied, 440 U.S. 909, 99 S.Ct. 1217, 59 L.Ed.2d 456 (1979), heavily relied upon by appellant, is distinguishable. In
 
 Brown,
 
 where there was no conspiracy charge, the jury found defendant guilty of four substantive counts and also of a RICO count in which the four counts were charged as predicate acts of racketeering. The Third Circuit reversed the convictions on two of the substantive counts for insufficient evidence. However, unlike the present case in which the conspiracy counts covered the substantive offenses charged as predicate acts, in
 
 Brown
 
 the substantive offenses charged as predicate acts were dis
 
 *1125
 
 tinct and hence it was arguably impossible to determine from the verdict which offenses the jury relied upon in finding a pattern of racketeering. Accordingly, the Third Circuit also invalidated the RICO conviction. But see
 
 United States v. Parness,
 
 503 F.2d 430, 438 (2d Cir. 1974), cert. denied, 419 U.S. 1105, 95 S.Ct. 775, 42 L.Ed.2d 801 (1975).
 

 Finally, appellant attacks the RICO conviction because the judge charged that the securities fraud counts could be a predicate act of racketeering. Weisman argues that because the Theatre was not constructed and in operation until 1975, it was not an “enterprise” in 1973 when the acts of securities fraud took place. Consequently, the argument goes, securities fraud could not constitute a predicate act of racketeering through which Weisman “conducted the affairs of an enterprise,” within the meaning of section 1962(c). We reject this view as an overly restrictive interpretation on these facts of the meaning of “enterprise” within the context of that section. While that provision is apparently inapplicable to acts of racketeering occurring before the creation or acquisition of an enterprise,
 
 [6]
 
 we believe that there was sufficient evidence to allow the jury to conclude that an enterprise was in existence well before the acts of securities fraud in 1973. For example, after its incorporation in 1971, the Theatre adopted bylaws, secured counsel and hired employees, established offices, sought a construction loan, entered negotiations with a real estate firm for a construction site, and began entering performance contracts with various entertainers. The procurement of additional funds through the 1973 public offering was thus simply another, admittedly crucial, part of the Theatre’s continuing affairs, and the jury could therefore conclude that the fraud that occurred in connection with the public offering constituted an act of racketeering activity undertaken in the conduct of the Theatre’s affairs.
 

 B.
 
 The Confession.
 

 Weisman also argues that the district court erred in not suppressing certain statements he made to the government on September 19, 1977. Weisman had been arrested three days before pursuant to a warrant issued against him and his wife for allegedly making false statements on a bank loan application in violation of 18 U.S.C. § 1014, a charge unrelated to the present indictment. Weisman was advised of his
 
 Miranda
 
 rights and, after signing a waiver of rights form, was questioned by Assistant United States Attorney Nathaniel Akerman. The focus of the interrogation, however, soon shifted from the alleged bank loan fraud to possible criminal activities engaged in by Weisman in connection with the Theatre’s operations. Akerman outlined the already substantial evidence against Weisman and suggested that he faced a twenty-year prison term for racketeering. Weisman was informed that if he cooperated in the grand jury’s ongoing investigation of the Theatre’s operations, the fact of his cooperation would be brought to the attention of the judge. Apparently as a further incentive, the government declined to execute the arrest warrant for Weis-man’s wife on the bank loan fraud charges. Weisman agreed to cooperate; after answering questions for several hours, he was released on his own recognizance.
 

 The following day, the Weisman was formally arraigned before United States District Judge Knapp on the bank loan fraud charges and, with the government’s consent, was again released from custody. Two days later, on September 19, 1977, Weisman again met with Akerman and several government agents. After being advised of his rights and signing a second waiver form, Weisman continued to answer questions concerning the operation of the Theatre. On October 2,1977, the complaint against the Weismans concerning the fraudulent bank loan application was dismissed on the government’s motion. Weisman, however, subsequently declined to cooperate further in the Theatre investigation.
 

 Prior to trial on the present indictment, Weisman moved to suppress his statements
 
 *1126
 
 of September 16 and 19 as the products of an illegal arrest. Judge Sweet ruled that the arrest had been improper because of lack of probable cause and because it was partially motivated by a desire to obtain Weisman’s cooperation in the grand jury investigation of the Theatre. Accordingly, the judge suppressed Weisman’s statements of September 16. The court nonetheless declined to suppress the September 19 statements, concluding the intervening circumstances had sufficiently dissipated the taint of the original arrest. See
 
 United States v. DePalma,
 
 461 F.Supp. 800, 831-35 (S.D.N.Y.1978).
 

 Weisman now contends that the failure to suppress the September 19 statements was erroneous under the Supreme Court’s controlling decision in
 
 Brown v. Illinois,
 
 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1974). In
 
 Brown,
 
 the Court noted that statements obtained after an illegal arrest need not be excluded at trial if the causal connection between the arrest and the statements was broken. The Court specifically noted that the administration of
 
 Miranda
 
 warnings, the temporal proximity of the arrest and the statements, the presence of “intervening circumstances,” and the “purpose and flagrancy of the official misconduct” were all factors relevant to a determination of whether the statements were obtained through exploitation of an illegal arrest. Id. at 603-04, 95 S.Ct. at 2261-2262. In the present case, Judge Sweet • assessed Weisman’s September 19 statements in light of the
 
 Brown
 
 criteria and concluded that they were the result of a “voluntary and informed decision by Weisman to cooperate with the government” rather than the direct fruit of the September 16 illegal arrest.
 
 DePalma,
 
 supra, 461 F.Supp. at 835. Specifically, the court noted the three-day lapse between statements, the formal arraignment of Weisman before Judge Knapp, the release of Weisman on his own recognizance and the accompanying opportunity to consult with counsel, the general lack of governmental intimidation, and Weisman's informed waiver of his rights prior to the September 19, 1977 discussions. The judge concluded that these created a “sufficient break in the steam of events to insulate the later statements.” Id.
 

 We agree with this analysis. Although Weisman was never entirely free of the shadow of the illegal arrest, we believe that the facts cited by Judge Sweet were sufficient to dissipate the coercive impact of that arrest. Nor do we find the government’s misconduct so flagrant as to require a prophylactic invocation of the exclusionary rule. Although the arrest was held to lack probable cause and was designed, at least in part, to obtain Weisman’s cooperation in the Theatre investigation, the district court did not find the government’s action to have been in bad faith or without any evidentiary justification. In the absence of such indications of government misconduct, we have held that the exclusionary rule need not automatically be invoked if the taint of the original arrest had been purged by intervening circumstances. See
 
 United States ex rel. Pella v. Reid,
 
 527 F.2d 380, 382-83 (2d Cir. 1975). Accordingly, we find that Weisman’s September 19 statements were admissible.
 

 C.
 
 The Reverse Immunity Claim.
 

 Weisman also argues that his convictions on the securities fraud and obstruction of justice counts should be reversed because of the government’s improper refusal to grant use immunity to two defense witnesses who allegedly would have exculpated him. In so arguing, Weisman seeks to take advantage of a favorable ruling by Judge Sweet on a similar claim raised by Weisman’s co-defendant, Leonard Horwitz. Following his conviction, Horwitz moved for a new trial, arguing that he had been denied due process by the government’s refusal to grant use immunity to two of his witnesses, who themselves were under a continuing government investigation for their role in the Theatre’s affairs and who were therefore unwilling to testify unless immunized. Judge Sweet granted the motion for a new trial at which, he indicated, the testimony of the government’s immunized witnesses
 
 *1127
 
 would be suppressed if Horwitz’s witnesses were not similarly immunized.
 
 [7]
 

 Weisman now argues that Judge Sweet’s ruling on Horwitz’s motion for a new trial should be extended to him since the same transactions and testimony are supposedly involved. However, we find it unnecessary to determine whether Weisman falls within the ambit of Judge Sweet’s ruling, or to assess the validity of the ruling itself, since we conclude that Weisman waived any such claim by failing to raise it properly in the district court. Although the issue of reverse immunity was raised by Horwitz in both trials and in his post-conviction motion for a new trial, Weisman never moved during either trial to immunize any potential defense witnesses and never sought post-conviction relief from the district court on this ground. However, after he had filed a notice of appeal from his conviction and after the district court had ruled favorably on Horwitz’s motion for a new trial, Weisman by motion requested the district court to clarify the record to indicate that he too had raised the reverse immunity claim. The court denied the motion, and Weisman subsequently sought and obtained an order from this court remanding the case to the district court for the limited purpose of determining whether Weisman had raised the reverse immunity issue on the record.
 

 In an opinion dated November 26, 1979, Judge Sweet concluded that “Weisman failed to properly raise the issue of reverse immunity prior to the time of appeal.” The court acknowledged that during both trials a motion made by one defendant was deemed to be adopted by all defendants. Judge Sweet, however, went on to note that this practice was employed primarily on “evidentiary objections” and did not extend to post-trial proceedings. Hence, Horwitz’s request for immunity for his witnesses during trial and his post-conviction motion for a new trial on this ground did not raise a similar claim on behalf of Weisman. In addition, the district court noted that because Weisman was in a “somewhat different evidentiary position” with respect to the securities fraud and obstruction of justice counts, “it would have been incumbent upon [him] ... to address the proof as it applied to him in order to advance the same claim of deprivation of constitutional right.”
 

 We see no reason to disturb this ruling. The district court’s practice of treating motions made by one defendant during trial as covering all defendants cannot logically be extended to particularized requests after trial by a single defendant that do not relate to the group of defendants as a whole. Horwitz’s demand for use immunity for his witnesses constituted such a particularized request, since it derived from the nature of the government’s evidence against
 
 him
 
 and the potential availability of evidence exculpating
 
 him.
 
 As the district court noted, Weisman was inevitably in a somewhat different evidentiary posture than Horwitz, and hence the burden was properly upon him to show why he would be denied due process if his witnesses were not immunized. Indeed, a contrary rule would force the district judge to determine on his own initiative and without assistance which particularized requests of one defendant should be extended to other co-defendants. Alternatively, Weisman asks us to overlook his failure to press the point below and to invoke the plain error doctrine. The government, however, strongly asserts that there was no error in the district court’s failure to immunize Weisman’s witnesses and that even if the failure to order use immunity was erroneous, this is a “particularly inappropriate” case “to notice an error not objected to below.” See
 
 United States v. Calfon,
 
 607 F.2d 29, 31 (2d Cir. 1979). The government asserts that if the argument had been made to Judge Sweet and if he had held that his reverse immunity ruling should apply to Weisman, the government might have decided to try Weisman separately, without the evidence furnished by its immunized witnesses. It is true that
 
 *1128
 
 the government’s evidence against Weis-man on the other aspects of the stock fraud not involving Horwitz’s transactions was very strong; consequently, it is not an implausible claim that the government might have altered its trial strategy in the face of a timely reverse immunity request by Weis-man. Under all the circumstances, we reject the invitation to find plain error. Thus, because Weisman never asserted or argued in a timely fashion that Horwitz’s reverse immunity claim applied to him, we affirm Judge Sweet’s holding that Weisman waived the claim. See
 
 U. S. v. Indiviglio,
 
 352 F.2d 276, 280 (2d Cir. 1965), cert. denied, 383 U.S. 907, 86 S.Ct. 887, 15 L.Ed.2d 663 (1966).
 

 D.
 
 Tape-Recorded Evidence.
 

 As previously noted, a substantial portion of the government’s evidence against Weisman consisted of tape-recorded conversations obtained through court-ordered electronic surveillance and the body recorder worn by government informant Brodsky. At trial, Weisman requested the district court, pursuant to Federal Rule of Evidence 106, to compel the government to play in their entirety tapes, portions of which the government intended to use. Weisman also sought to admit into evidence, pursuant to Rules 803(24) and 804(b)(5), tape recordings that the government did not intend to use at trial.
 

 The district judge denied both requests. He concluded that Rule 106 did not require the government to play tapes in their entirety if the omitted portions were not “necessary to clarify, or make not misleading, that which is introduced.”
 
 [8]
 
 Subsequently, the district court ruled on numerous specific applications under Rule 106, granting some and denying some. Judge Sweet also concluded that those tapes not played by the government should not be admitted under Rules 803(24) and 804(b)(5), the residual exceptions to the hearsay rule.
 
 [9]
 
 The court reasoned that the recordings failed to satisfy the requirements of the Rules, since the recordings did not embody the necessary “circumstantial guarantees of trustworthiness” and were not “more probative” than
 
 *1129
 
 other evidence that could be procured by Weisman, including his own testimony. We find the district court’s ruling on both evi-dentiary issues to be well within the discretion necessarily exercised by a trial judge, and see no reason to elaborate further on the analysis set forth in the judge’s memorandum opinion, dated November 21, 1978.
 

 III. Cannatella
 

 A.
 
 Joinder and Severance Claims.
 

 On appeal, Cannatella argues that the bankruptcy fraud charges against him were improperly joined under Federal Rule of Criminal Procedure 8(b) with the securities fraud counts charged in the indictment against the other defendants. However, we find that the joinder was proper, substantially for the reasons set forth by Judge Sweet.
 
 United States v. DePalma,
 
 461 F.Supp. 778, 787-90 (S.D.N.Y.1978).
 

 Rule 8(b) permits the joint trial of defendants who are “alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses.” This requirement is met by the RICO count of the indictment. As previously noted, the jury could properly find that Weisman engaged in a “pattern of racketeering activity” that included, but was not limited to, the predicate acts of bankruptcy fraud with which Cannatella was charged. If, as we have already concluded, the acts of bankruptcy fraud could properly be considered part of a “pattern of racketeering activity,” we see no reason why they could not similarly constitute part of a “series of acts or transactions constituting an offense” within the meaning of Rule 8(b). Indeed, a construction of Rule 8(b) that required a closer relationship between transactions than that necessary to establish a “pattern of racketeering activity” under RICO might possibly prohibit joinder in circumstances where Congress clearly envisioned a single trial.
 

 While we conclude that the RICO count alleges a sufficient nexus between the counts of securities fraud and bankruptcy fraud to establish that they were part of the “same series of acts or transactions,” appellant Cannatella is in a somewhat unusual position because he was not indicted on the unifying RICO count, but was instead only charged with the various counts of bankruptcy fraud. However, this does not affect the propriety of joinder under Rule 8(b). The Rule specifically provides that “all of the defendants need not be charged in each count” and this language has generally been construed to permit join-der in cases where individual defendants are charged with some but not all counts of the indictment. See, e. g.,
 
 United States v. Wofford,
 
 562 F.2d 582, 585 (8th Cir. 1977), cert. denied, 435 U.S. 916, 98 S.Ct. 1471, 55 L.Ed.2d 507 (1978);
 
 United States v. Scott,
 
 413 F.2d 932, 934-35 (7th Cir. 1969);
 
 Haggard v. United States,
 
 369 F.2d 968, 973-75 (8th Cir. 1966). Thus, Cannatella’s indictment for the various counts of bankruptcy fraud, which also were properly charged as predicate acts of racketeering under the unifying RICO count, made joinder under Rule 8(b) appropriate.
 

 Cannatella responds, however, that even if the bankruptcy fraud and securities fraud claims were properly joined under Rule 8(b), he was nonetheless entitled to a severance of trial pursuant to Federal Rule of Criminal Procedure 14. Admittedly, Can-natella entered only during the Theatre’s closing scenes, and for several reasons would understandably prefer to have been tried separately from Weisman and the remaining co-defendants. Weisman’s criminal activities extended far beyond those of Cannatella, and it was only during that portion of the trial dealing with the securities fraud charges that the peripheral association of reputed mobster Carlo Gambino with the Theatre, as well as the prior criminal records of DePalma and Fusco, came to light.
 

 Thus, Cannatella was concerned over possible evidentiary spillover from portions of the trial unrelated to the bankruptcy fraud counts, and may conceivably have had a better chance of acquittal had his motion for severance been granted. Nonetheless, the decision to grant or deny a severance pursuant to Rule 14 is within the
 
 *1130
 
 broad discretion of the trial court and will not be overturned on appeal absent some showing that the defendant suffered substantial prejudice due to the joint trial. See
 
 United States
 
 v.
 
 Ochs,
 
 595 F.2d 1247, 1260 (2d Cir.), cert. denied, 444 U.S. 955, 100 S.Ct. 435, 62 L.Ed.2d 328 (1979). In the instant case, consideration of judicial economy weighed heavily in favor of a single trial, and we find no countervailing indications of actual prejudice to Cannatella that would mandate a severance. Before trial, the district judge carefully questioned prospective jurors concerning their knowledge of Gambino and excused those whose impartiality was in doubt. Furthermore, during the trial Judge Sweet repeatedly admonished the jury to evaluate the offenses charged and the evidence presented against each defendant separately, and the acquittal on all counts of co-defendant Nersesian, who was charged with stock fraud violations, indicates that the jury was able to do so. The danger of evidentiary spillover was further diminished by the fact, implicit in Cannafella’s challenge to joinder under Rule 8(b), that there was little overlap at trial between the evidence pertaining to the securities fraud counts and that concerning the bankruptcy fraud counts. Accordingly, we find no error in the refusal to sever.
 

 B.
 
 Sufficiency of the Evidence.
 

 Appellant Cannatella also challenges the sufficiency of the evidence on two grounds. Appellant first contends that under this court’s decision in
 
 United States v. Geaney,
 
 417 F.2d 1116 (2d Cir. 1969), cert. denied, 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970), there was insufficient non-hearsay evidence of Cannatella’s involvement in the alleged bankruptcy fraud conspiracy to permit the introduction into evidence of incriminating hearsay statements of Cannatela’s co-conspirators. Under
 
 Geaney,
 
 before a court may admit into evidence the out-of-court declarations of a defendant’s co-conspirator, it must first find by “a fair preponderance of the evidence independent of the hearsay utterances” that the defendant participated in the conspiracy. Id. at 1120. The district court, in ruling that the
 
 Geaney
 
 test had been met, relied primarily on tape-recorded phone conversations on June 1, 1977 between Cannatella and DePalma and on July 7,1977 between Cannatella and Fusco. The court, however, also noted the presence of “additional evidence” connecting Cannatella with the conspiracy. We have reviewed the record, and we hold that the district court’s determination that the
 
 Geaney
 
 standard had been met was correct. The telephone conversations noted by the district court clearly suggest that Cannatella knew of and was participating in the conspiracy to commit bankruptcy fraud by skimming the Theatre’s receipts. Appellant argues, in elaborate detail, that each conversation is susceptible of an innocent interpretation. That may be, but in each instance the judge and the jury could reject it (and they both obviously did), see
 
 United States v. Stanchich,
 
 550 F.2d 1294, 1300 (2d Cir. 1977), particularly when, as here, the proffered interpretation is implausible.
 

 Appellant also asserts that even if the
 
 Geaney
 
 standard was met and the hearsay declarations of his co-conspirators were properly admitted, the evidence was insufficient to prove his guilt beyond a reasonable doubt. Our review of the evidence, however, persuades us that the jury reasonably could conclude that after 1976 Cannatella was exercising primary financial control over the Theatre, that the skimming of Theatre revenues continued unabated, and that Cannatella participated in the division and distribution of the skimmed revenues. Accordingly, the jury could reasonably find that Cannatella was guilty of the offenses charged.
 

 IV. Miscellaneous
 

 Both appellants raise additional subsidiary challenges to their conviction. For example, both appellants argue that the government engaged in improper conduct during the trial, while Weisman claims that various evidentiary rulings by the district court were incorrect and Cannatella asserts that Judge Sweet improperly marshalled
 
 *1131
 
 the evidence with respect to him. We have reviewed all of appellants’ arguments carefully, however, and find them to be without merit. Accordingly, the judgments of conviction are affirmed in all respects.
 

 APPENDIX A
 

 § 1961. Definitions
 

 As used in this chapter—
 

 (1)“Racketeering activity” means (A) any act or threat involving murder, kidnap-ing, gambling, arson, robbery, bribery, extortion, or dealing in narcotic or other dangerous drugs, which is chargeable under State law and punishable by imprisonment for more than one year; (B) any act which is indictable under any of the following provisions of title 18, United States Code: Section 201 (relating to bribery), section 224 (relating to sports bribery), sections 471, 472, and 473 (relating to counterfeiting), section 659 (relating to theft from interstate shipment) if the act indictable under section 659 is felonious, section 664 (relating to embezzlement from pension and welfare funds), sections 891-894 (relating to extortionate credit transactions), section 1084 (relating to the transmission of gambling information), section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), section 1503 (relating to obstruction of justice), section 1510 (relating to obstruction of criminal investigations), section 1511 (relating to the obstruction of State or local law enforcement), section 1951 (relating to interference with commerce, robbery, or extortion), section 1952 (relating to racketeering), section 1953 (relating to interstate transportation of wagering paraphernalia), section 1954 (relating to unlawful welfare fund payments), section 1955 (relating to the prohibition of illegal gambling businesses), sections 2314 and 2315 (relating to interstate transportation of stolen property), sections 2341-2346 (relating to trafficking in contraband cigarettes), sections 2421-24 (relating to white slave traffic), (C) any act which is indictable under title 29, United States Code, section 186 (dealing with restrictions on payments and loans to labor organizations) or section 501(c) (relating to embezzlement from union funds), or (D) any offense involving [bankruptcy] fraud . , fraud in the sale of securities, or the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in narcotic or other dangerous drugs, punishable under any law of the United States;
 

 (2) “State” means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, any territory or possession of the United States, any political subdivision, or any department, agency, or instrumentality thereof;
 

 (3) “person” includes any individual or entity capable of holding a legal or beneficial interest in property;
 

 (4) “enterprise” includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity;
 

 (5) “pattern of racketeering activity” requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity;
 

 (6) “unlawful debt” means a debt (A) incurred or contracted in gambling activity which was in violation of the law of the United States, a State or political subdivision thereof, or which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury, and (B) which was incurred in connection with the business of gambling in violation of the law of the United States, a State or political subdivision thereof, or the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate;
 

 (7) “racketeering investigator” means any attorney or investigator so designated by the Attorney General and charged with the duty of enforcing or carrying into effect this chapter;
 

 
 *1132
 
 (8) “racketeering investigation” means any inquiry conducted by any racketeering investigator for the purpose of ascertaining whether any person has been involved in any violation of this chapter or of any final order, judgment, or decree of any court of the United States, duly entered in any case or proceeding arising under this chapter;
 

 (9) “documentary material” includes any book, paper, document, record, recording, or other material; and
 

 (10) “Attorney General” includes the Attorney General of the United States, the Deputy Attorney General of the United States, any Assistant Attorney General of the United States, or any employee of the Department of Justice or any employee of any department or agency of the United States so designated by the Attorney General to carry out the powers conferred on the Attorney General by this chapter. Any department or agency so designated may use in investigations authorized by this chapter either the investigative provisions of this chapter or the investigative power of such department or agency otherwise conferred by law.
 

 § 1962. Prohibited activities
 

 (a)It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. A purchase of securities on the open market for purposes of investment, and without the intention of controlling or participating in the control of the issuer, or of assisting another to do so, shall not be unlawful under this subsection if the securities of the issuer held by the purchaser, the members of his immediate family, and his or their accomplices in any pattern or racketeering activity of the collection of an unlawful debt after such purchase do not amount in the aggregate to one percent of the outstanding securities of any one class, and do not confer, either in law or in fact, the power to elect one or more directors of the issuer.
 

 (b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.
 

 (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise’s affairs through a pattern of racketeering activity or collection of unlawful debt.
 

 (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section.
 

 [1]
 

 . Defendant Weisman was sentenced to multiple concurrent sentences, resulting in a six and one-half year prison term, three years probation following expiration of the prison term, and $15,000 in fines. Defendant Cannatella also received multiple concurrent sentences, resulting in a one-year prison term, to be followed by three years probation.
 

 [2]
 

 . For example, appellant suggests that absent a requirement of relatedness, a RICO prosecution could be brought against the owner of a “Mom and Pop” grocery who bribed a local official to obtain a zoning variance, enabling the owner to build a store, and who ten years later filed a false report with the bankruptcy court when the store failed.
 

 [3]
 

 . Appellant relies heavily on a statement in a Senate report dealing with RICO which states that the “factor of continuity plus relationship combines to produce a pattern.” S.Rep.No.91-617, 91st Cong., 1st Sess. 158. See also McClellan, The Organized Crime Control Act (S. 30) or Its Critics: Which Threatens Civil Liberties, 46 Notre Dame Lawyer 55, 144 (1970). The government, however, responds by citing other portions of the legislative history, including the same Senate report relied on by appellant, that fail to indicate any requirement of relatedness between predicate acts. We, however, find the authority cited by both sides for their interpretation of “pattern” to be at best inconclusive. For example, the reference to a “relationship” in the Senate report relied on by appellant fails to disclose whether the relationship must be between the predicate acts themselves, or, as we believe, between each predicate act and the conduct of the affairs of an enterprise.
 

 [4]
 

 . Furthermore, even if we were to conclude that the predicate acts themselves must be related in order to demonstrate a “pattern of racketeering,” we would find that the predicate acts of racketeering were closely related. Weisman was a perpetrator of all of the acts of fraud and all were undertaken during the conduct of the Theatre’s affairs. Furthermore, the acts of stock fraud harmed legitimate investors in the Theatre and many of these same investors were again harmed when the later acts of bankruptcy fraud prevented the Theatre’s financial rehabilitation. The acts of fraud were also all directed toward the same goal of enriching Weisman and his confederates at the expense of the Theatre and through the device of the Theatre. Finally, the methods of committing the acts of securities fraud were similar, as were the methods used in the acts of bankruptcy fraud. In light of the numerous similarities between the predicate acts of racketeering, we find appellant’s contention that a jury could find that the acts of racketeering activity he engaged in were sporadic and1 unrelated to be completely untenable.
 

 [5]
 

 . The district court concluded that the specific violations of securities laws charged elsewhere in the indictment could only constitute a single predicate act of racketeering because they arose “out of the same episode.” The substantive counts of bankruptcy fraud, in contrast, were charged as separate predicate acts of racketeering activity because they were distinct episodes.
 

 [6]
 

 . Cf. 18 U.S.C. §§ 1962(a) and (b).
 

 [7]
 

 . The government appealed from that ruling; the appeal was argued before this panel on the same day as the instant appeal and is now sub judice.
 

 [8]
 

 . Rule 106 provides:
 

 When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require him at that time to introduce any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.
 

 [9]
 

 . Rule 803(24) provides in relevant part:
 

 The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
 

 (24)
 
 Other exceptions.
 
 A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant.
 

 Rule 804(b)(5) provides in relevant part:
 

 (b)
 
 Hearsay exceptions.
 
 The following are not excluded by the hearsay rule if the de-clarant is unavailable as a witness:
 

 (5)
 
 Other exceptions.
 
 A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant.