**UNITED STATES of America, Appellee,**

v.

**Raul RIVERA, Defendant,**

**Neil Johnson, a/k/a Daddy O, Defendant–Appellant.**

**No. 1015, Docket 94–1427.**

United States Court of Appeals, Second Circuit.

Argued March 24, 1995.

Decided July 24, 1995.

Jon L. Schoenhorn, Hartford, CT (Alice M. Gray, on the brief), for defendant-appellant.

Deborah R. Slater, Asst. U.S. Atty., Hartford, CT (Christopher F. Droney, U.S. Atty., D. Conn., and Mark G. Califano, Asst. U.S. Atty., New Haven, CT, of counsel, Julie M. Duchow, Law Student Intern, Northeastern Law School, on the brief), for appellee.

Before: KEARSE, and LEVAL, Circuit Judges, and BAER, District Judge.*

LEVAL, Circuit Judge:

Neil Johnson appeals his conviction and sentence following a jury trial before the District Court for the District of Connecticut (Peter C. Dorsey, *Chief Judge*). After a five-day trial, the jury convicted Johnson of one count of conspiracy to possess drugs with intent to distribute, in violation of 21 U.S.C. § 846. Johnson's co-defendant, Raul Rivera, had pleaded guilty to the same conspiracy charge and testified against Johnson at trial. The district court sentenced Johnson to 320 months in prison, eight years of supervised release, a fine of $25,000 and a mandatory special assessment of $50.

Johnson's principal claims of error relate to: (i) testimony advising the jury that the defendant had "done time" on an earlier occasion; and (ii) the admission of prejudicial incriminating hearsay contained in an attach-

---

* The Honorable Harold Baer, Jr., United States District Judge for the Southern District of New York, sitting by designation.

ment to the cooperating witness's plea agreement. We find that Johnson's conviction must be vacated.

## Background

Johnson was arrested on November 24, 1993 as a result of two separate investigations by federal law enforcement agents working in opposite corners of the country. For several months during 1993, agents from the Drug Enforcement Administration ("DEA") in Hartford, Connecticut had suspected Johnson of involvement in a heroin trafficking ring operating in the area. Unbeknownst to the DEA, agents of the United States Customs Service detained Johnson on September 8, 1993 as he and two others were driving a rented car from Laredo, Texas, through a border checkpoint into Mexico. In enforcement of 31 U.S.C. § 5316, the federal statute governing the export of monetary instruments, the customs agents asked Johnson if he was carrying currency in excess of $10,000. Johnson answered that he was not. A subsequent search assisted by a currency detection dog revealed approximately $14,000 in cash hidden in a back door panel of the car. Johnson told the agents that the money was start-up capital for a restaurant he intended to open in Laredo, and that he had hidden it out of concern that one of his traveling companions might steal it. The customs agents seized the cash and the rental car, but allowed Johnson and his two passengers to reenter the United States on foot. However, customs and other law enforcement agents later visited the motel in Laredo where Johnson was staying. They observed a man there later identified as Raul Rivera. Johnson consented to a search of his room. No contraband was found.

The next day, a customs agent in Texas called Special Agent David Aldridge of the DEA in Hartford to inform him of these events. Approximately four weeks later, customs officials contacted Aldridge again to say that they had received a tip from a confidential informant that Raul Rivera would be traveling from Laredo to Hartford by air in mid-October. Aldridge thereafter obtained the details of Rivera's airline bookings, and together with other agents, set up surveillance at the Bradley International Airport in Connecticut on October 17. The agents approached a man matching Rivera's description who disembarked from an American Airlines flight arriving from Dallas. Rivera agreed to speak with the agents and consented to a search of his person and carry-on luggage. Before the search proceeded, Rivera turned over two lumps of a brown substance, later identified as 132.7 grams of black tar heroin, which he had concealed in his clothing. He was placed under arrest and agreed to cooperate with law enforcement authorities. Rivera gave information that eventually led to Johnson's arrest and indictment.

At Johnson's trial, Rivera testified that the defendant ran a smuggling and distribution operation that obtained heroin from Mexico and sold it in the Bridgeport and Hartford area. Rivera stated that he had met Johnson, known to him as "Daddy–O," two years earlier when he began to buy heroin from Johnson to support his habit. Rivera testified that in approximately June of 1993, he began selling heroin for Johnson at the Dutch Point Housing Project in Hartford. In August, Johnson asked Rivera to accompany him to Laredo, Texas on a heroin purchasing trip. The first foray into Mexico was successful. On the second, however, which Johnson attempted without Rivera (who stayed behind in the motel in Laredo), Johnson returned empty-handed in a taxi and told Rivera that the money had been seized. Rivera testified that agents searched the motel room but failed to find two ounces of heroin which were hidden in a garment bag. Rivera transported the heroin to New York by bus. He was then driven to Bridgeport, where he met Johnson and delivered the drugs.

Rivera also related the details of a second trip he made to Laredo in October, 1993 to purchase four ounces of heroin. On this trip, Rivera traveled by train to Texas, where Johnson wired him additional money for expenses via Western Union. After purchasing the drugs, Johnson paid for a one-way plane ticket for Rivera's travel back to Connecticut. It was upon returning from this trip that Rivera was apprehended. The government presented Western Union receipts and travel

records bearing Johnson's name as purchaser to corroborate Rivera's account.

On cross-examination, Rivera admitted that he had several convictions for drug offenses, burglary and theft, and had a history of heroin addiction continuing up to and beyond the time of his arrest. He also acknowledged that he had used several aliases over the years and had pleaded guilty to his role in the instant narcotics conspiracy. The jury also heard that Rivera was benefiting from a cooperation agreement with the government in exchange for his testimony against Johnson.

Rivera was the government's main witness at trial. On the basis of testimony received from Rivera and a Hartford police detective at the sentencing hearing, the court sentenced Johnson to 320 months, a term in the middle of the guidelines range for a defendant with a base offense level of 38 and criminal history category of III.[1]

*Discussion*

A. *Testimony regarding defendant's prior incarceration*

■ At trial, defense counsel cross-examined Rivera about apparently inconsistent statements he had made regarding the length of his acquaintance with Johnson. Rivera stated on direct that he had met Johnson about two years earlier. On cross-examination defense counsel asked him if he had not told federal agents that he had known "Daddy-O" for ten years. Rivera responded, "I don't know Daddy-O. I known about him because he was [sic] Carl Robinson." Apparently not understanding the witness's statement, Judge Dorsey interrupted and asked Rivera to repeat his answer. Rivera then said, "I know him from Carl Robinson." Still perplexed as to what Rivera meant, the court asked the witness, "From what?" Rivera answered, "Carl Robinson. That's jail in Enfield."

Johnson's attorney immediately asked the court to strike the answer as unresponsive. The court denied this motion and rejected

defense counsel's request to approach the bench. During a recess, the defense moved for a mistrial, which the court denied. On the government's redirect examination, the government's attorney reopened the issue:

Q: Mr. Rivera, you testified earlier that you first met Daddy-O approximately two years ago?

A: Yes.

Q: Did you know Daddy-O before then?

A: Yes.

Q: How much longer before then had you known Daddy-O?

A: I don't remember. *We never talk, but I saw him when he was doing time at Carl Robinson.*

(Transcript, March 23, 1994, at 92) (emphasis added). The defense again moved to strike the answer as nonresponsive. The court demurred, stating that the comment was "responsive" and would be permitted to stand. Shortly afterward, the court recessed for an hour. Just before the jury was recalled, Johnson's attorney renewed his motion for a mistrial. After the government expressed its view that striking the references to Carl Robinson was appropriate, the court agreed that the comments were "obviously not responsive" and indicated that it would strike them from the record. Judge Dorsey then offered to instruct the jury to disregard the references to Johnson's incarceration, but observed that this would probably only "flag the issue" in the jury's mind. He further opined that the jurors would not "have the vaguest idea" what Carl Robinson was in any case. Defense counsel concurred that an admonition to the jury would do more harm than good. The defense then made a third motion for mistrial, which the court once again denied.

On appeal, Johnson argues that Judge Dorsey abused his discretion by refusing to grant a mistrial. We cannot agree with the government's contention that the episode was harmless because the jury would not have understood the meaning of the references to "Carl Robinson." The witness explained that

---

1. The district court estimated the amount of drugs distributed through Johnson's operation at one to three kilograms. This yielded a base offense level of 32, from which the court added 6 levels for possession of firearms and for organization of criminal activity.

Carl Robinson is a jail and that the defendant "was doing time" there. Even if the jurors were unfamiliar with the name "Carl Robinson," the added explanations made it clear that the defendant had a prior conviction. We need not rule, however, whether this showing of the defendant's prior conviction by itself would have required reversal. *United States v. Fermin,* 32 F.3d 674, 677 (2d Cir.1994) (in some instances improper introduction of prior criminal record constitutes incurable error), *cert. denied,* —— U.S. ——, 115 S.Ct. 1145, 130 L.Ed.2d 1104 (1995). When it is taken together with the prejudice that resulted from the government's introduction of the incriminating hearsay discussed below, reversal is required.

*B. The admission of hearsay evidence in the plea agreement*

In an effort to impeach Rivera by demonstrating a motive to fabricate, defense counsel cross-examined Rivera about his plea agreement and his cooperation. On defendant's offer, the plea agreement was received in evidence. In a sidebar conference a short time later, the government complained that the exhibit was incomplete as received, in that it was missing a two-page stipulation of facts that was incorporated by reference. Johnson objected to the inclusion of the stipulation on grounds of prejudice and hearsay. The court overruled this objection and admitted the document under the doctrine of completeness. Johnson contends he was seriously prejudiced by the erroneous receipt of this document. We agree.

The disputed document, titled "Attachment A—Stipulation of Offense Conduct" (the "Stipulation"), is incorporated by reference into Rivera's plea agreement. A paragraph of the agreement captioned "Stipulation" asserts that Rivera and the government "have entered into a stipulation which is attached to and made a part of this plea agreement." The Stipulation in turn recites that it "is incorporated into the preceding plea agreement." Although the Stipulation purported to represent a summary of government evidence against Rivera, it also included very substantial incriminating hearsay information about the trial defendant Johnson. What is

more, much of the information about Johnson's actions was attributed in the document to an unidentified, but obviously highly reliable, informant.

The Stipulation asserts that "an informant had told customs agents that Neil Johnson and ... Raul Rivera, would be travelling from [Laredo], Texas to Mexico to buy heroin." The informant said that the two men were staying in a certain hotel and had a large amount of cash with them which they intended to use to buy the heroin.

After narrating how the agents observed them at their hotel and later caught Johnson attempting to enter Mexico with $14,000 of concealed undeclared cash, the Stipulation goes on to report that the "informant had told [Customs] that Johnson was expected to make another trip to Texas to buy heroin." It continues that on October 17, 1993, the "informant had reported that, Raul Rivera, was then in Laredo, Texas, and had 5–6 ounces of black tar heroin in his possession ... [and] that Rivera would soon be leaving Texas by air, and would be arriving at the airport in Hartford, CT. on the evening of October 17, 1993. The informant identified Rivera by name and gave the agents a detailed description of him. The informant also said that Rivera would be carrying the heroin on his person."

The government's contention that the receipt of the Stipulation was justified to complete Rivera's plea agreement under Fed. R.Evid. 106 is completely without merit. Rule 106 provides:

> When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

Fed.R.Evid. 106 (1987). The mere fact that the Stipulation was incorporated into Rivera's plea agreement is insufficient to justify its admission on completeness grounds. We have interpreted Rule 106 to justify the admission of previously excluded portions of partially received documents or statements only when necessary to explain the admitted portion, to place it into context, to ensure a

fair and impartial understanding of the admitted portion, or to correct a misleading impression that might arise from excluding it. *United States v. Castro,* 813 F.2d 571, 575–76 (2d Cir.), *cert. denied,* 484 U.S. 844, 108 S.Ct. 137, 98 L.Ed.2d 94 (1987); *United States v. Marin,* 669 F.2d 73, 84 (2d Cir. 1982); *United States v. Weisman,* 624 F.2d 1118, 1128 (2d Cir.), *cert. denied,* 449 U.S. 871, 101 S.Ct. 209, 66 L.Ed.2d 91 (1980).

We can see no way in which the Stipulation was essential for the jury's understanding of Rivera's plea agreement, or to place it in context, or correct misleading impressions from it. The plea agreement was received as impeachment of Rivera, to substantiate Rivera's motive to fabricate so as to reduce the charges pending against him. Rivera had testified extensively before the jury regarding his own involvement in the heroin conspiracy, his arrest and indictment, and his plea. The Stipulation added nothing to the jury's understanding of the plea agreement for its relevant purpose.

Furthermore, we reject the government's contention that the information incriminating Johnson in the plea agreement was merely cumulative. To the contrary, this information added substantial power to the government's case. Rivera was the only government witness who placed heroin in the defendant Johnson's hands. As noted above, Rivera was vulnerable to impeachment because he had been caught with heroin and needed to supply evidence against others to earn a better deal for himself. The Stipulation corroborated his testimony against Johnson by telling the jury that, long before Rivera's arrest, an unidentified informant advised agents that Johnson and Rivera were involved in importing heroin from Mexico. The informant's reliability was powerfully supported by the fact that agents' observations confirmed his predictions. He told the agents that Johnson and Rivera would travel to Laredo with a large amount of cash to be used to buy heroin in Mexico. He reported where they would be staying. Sure enough, Johnson and Rivera came to Laredo, and were observed at the motel. Johnson was then stopped at the border, and $14,000 cash was found hidden in the panel of his rented car. The informant later advised that Rivera would be flying from Texas to Hartford, arriving in the evening of October 17, 1993, carrying heroin on his person. Sure enough, Rivera arrived in Hartford that evening on a flight from Dallas, and was found to have heroin on his person.

This highly incriminating hearsay would clearly have been inadmissible if offered by itself. *See* Fed.R.Evid. 802. The government was ill-advised to secure its admission by arguing completeness. *United States v. Terry,* 702 F.2d 299, 314 (2d Cir.) (Rule 106 does not render admissible evidence that is otherwise inadmissible), *cert. denied,* 461 U.S. 931, 103 S.Ct. 2095, 77 L.Ed.2d 304 (1983).

Nor was the prejudice cured by the court's cautionary instruction. Upon the receipt of the Stipulation, the court gave a lengthy instruction, which, in our view, served more to call attention to the prejudicial document than to protect the defendant from the hearsay contained in it. The instruction did not tell the jurors that they were forbidden from using the information in the Stipulation as proof that the defendant did the things it said he did.

We conclude that the prejudice resulting from the wrongful admission of the Stipulation was sufficiently great, especially when coupled with the misadventure showing that the defendant had done time at Carl Robinson, to require that the conviction be vacated and the case remanded for retrial.

## Conclusion

The judgment of conviction is vacated and the case remanded to the district court for further proceedings.