UNITED STATES of America,

v.

Philip RASTELLI et alia, Defendants.

No. CR-85-00354.

United States District Court,
E.D. New York.

Feb. 27, 1986.

SIFTON, District Judge.

The sixty-four count indictment in this case charges seventeen defendants with a variety of offenses under federal law relating to their involvement in the furniture moving business. The case is now before this Court on various defendants' pretrial motions which are described and discussed below.[1]

The 64 counts alleged in the indictment may be summarized as follows:

1. In addition to the pretrial motions disposed of by this written opinion, a number of discovery motions and substantive motions have been decided in oral opinions of the undersigned.

Count 1 (the RICO count) charges that from on or about January 1, 1964, until the filing of the indictment defendants Philip Rastelli, Nicholas Marangello, Joseph Massino, Anthony Ficarotta, Carmine Rastelli, James Bracco, Charles Martelli, Charles Agar, Anthony Cantatore, Warren Weissman, and Joseph Schwartz (referred to for convenience as the RICO defendants) were members of an enterprise which was an association-in-fact [see 18 U.S.C. § 1961(4)] consisting of members and associates of what is called the "Bonanno Crime Family" (P. Rastelli, Marangello, Massino, Ficarotta); officers, representatives, trustees, members and associates of the International Brotherhood of Teamsters Local 814 ("Local 814") or the Local 814 Welfare Fund, Pension Fund, and Annuity Fund (the "benefit funds") (Bracco, Martelli, C. Rastelli, Agar, Cantatore); and owners, officers and employees of moving and storage companies, sports and exhibition facilities and other commercial firms whose employees were represented by Local 814 (Weissman and Schwartz). The indictment alleges that the enterprise was formed in order to promote a number of mutually dependent objectives: the union officials and organized crime members and associates sought to control and exercise influence over Local 814 and its benefits funds by demanding and receiving payoffs for the benefits of labor peace and preferential treatment by other defendants to selected companies; the company owners sought to enhance their business and to enrich themselves through the enterprise by making those payoffs in order to obtain preferential treatment from Local 814 and the benefit funds and in some instances to use the union and organized crime members of the enterprise to eliminate competition from non-enterprise employers.

The RICO count further alleges that the affairs of the enterprise were conducted through a pattern of racketeering activity that included receipt and payment of unlawful union and benefit fund payoffs, extortion, arson, robbery, and mail fraud.

The remaining counts of the indictment charge substantive offenses based on many of the same acts or transactions that are alleged as predicate acts in the RICO count. The defendants named in the substantive counts but not in the RICO count include Dominic Mariani, Phillip Goldstein, John Konovitch, Charles Rosenberg, John Scordato, and Frank Muli.

Thus, counts 2 through 9 allege that in 1980–1981, P. Rastelli, C. Rastelli, Marangello, Bracco, Martelli, Agar, and Cantatore received illegal labor payoffs in violation of 29 U.S.C. § 186(b)(1) from the following companies: Cirker Moving and Storage Company, Inc. ("Cirker") (two payoffs), Certified Moving and Storage Company ("Certified"), Harle Company ("Harle"), Joseph Eletto Transfer, Incorporated and Venetian Trucking Company ("Eletto"), The Seven Santini Brothers ("7 Santini"), Benny's Moving and Storage ("Benny's"), and Clancy-Cullen Movers ("Clancy").

Counts 10–25 allege that in 1981–1985, P. Rastelli, C. Rastelli, Bracco, Martelli, Agar, Cantatore, and Massino received illegal labor payoffs in violation of 29 U.S.C. § 186(b)(1) from the following companies: Cirker (two payoffs), Certified, Eletto (seven payoffs), 7 Santini (two payoffs), Benny's, Clancy, Block and Rose Moving and Storage ("Block and Rose"), and Raintree Sportswear ("Raintree").

Count 26 alleges that between January 1, 1976, and the date of the filing of the indictment, P. Rastelli, Marangello, Massino, Bracco, and Martelli, in violation of 18 U.S.C. § 1951, extorted a payment of money from Eletto.

Count 27 alleges that between September 1, 1978, and July 31, 1982, Ficarotta, Bracco, Martelli, Agar, Weissman, Schwartz, and Mariani, in violation of 18 U.S.C. §§ 1951 and 1952, engaged in a bid-rigging extortion scheme involving government contracts. The indictment alleges that Weissman, Schwartz, and Mariani made payments to Ficarotta, Bracco, Martelli, and Agar and that the defendants, through the use of threats, prevented competing moving and storage companies from bidding for government moving contracts.

Counts 28 through 31 allege that between January 1, 1979, and December 31, 1980, P. Rastelli, C. Rastelli, Marangello, Ficarotta, Bracco, Martelli, Agar, and Cantatore received illegal labor payoffs in violation of 29 U.S.C. § 186(b)(1) from the following companies: Guardian Worldwide Movers and Washington Moving and Storage ("Guardian"), Deluxe Vans Incorporated ("Deluxe"), Wagner Moving and Storage ("Wagner"), and Schwartz Moving and Storage ("SMT").

Counts 32 through 35 allege that between January 1, 1981, and July 31, 1982, P. Rastelli, C. Rastelli, Massino, Ficarotta, Bracco, Martelli, Agar, and Cantatore received illegal labor payoffs in violation of 29 U.S.C. § 186(b)(1) from the following companies: Guardian, Deluxe, Wagner, and SMT.

Counts 36 through 39 allege that between January 1, 1979, and July 31, 1982, Weissman for Deluxe and Schwartz for SMT made illegal labor payoffs in violation of 29 U.S.C. § 186(a)(2).

Counts 40 through 43 allege that between January 1, 1979, and July 31, 1982, Bracco, Martelli, Ficarotta, Agar, and Cantatore received illegal employee benefit fund payoffs in violation of 18 U.S.C. § 1954 from the following companies: Guardian, Deluxe, Wagner, and SMT.

Counts 44 and 45 allege that between January 1, 1979, and July 31, 1982, Weissman for Deluxe and Schwartz for SMT made illegal employee benefit fund payoffs in violation of 18 U.S.C. § 1954.

Count 46 alleges that between October 1, 1979, and June 30, 1980, P. Rastelli and C. Rastelli received illegal labor payoffs from the New York Islanders in violation of 29 U.S.C. § 186(b)(1).

Count 47 alleges that between August 1, 1983, and August 30, 1984, C. Rastelli received illegal labor payoffs from the New York Islanders in violation of 29 U.S.C. § 186(b)(1).

Counts 48 and 49 allege that between 1975 and 1981 P. Rastelli, C. Rastelli, Bracco, and Martelli received illegal labor pay-offs from Eldee Industries and Blue Ribbon Trucking Corp. ("Eldee") in violation of 29 U.S.C. § 186(b)(1).

Count 50 alleges that between September 1, 1981, and April 30, 1982, Bracco, Martelli, Agar, and Goldstein, in violation of 18 U.S.C. §§ 1951 and 1952, extorted money from Steven's Appliances.

Count 51 alleges that between September 1, 1981, and April 30, 1982, Goldstein received illegal labor payoffs from Steven's Appliances in violation of 29 U.S.C. § 186(b)(1).

Count 52 alleges that in 1981 P. Rastelli, C. Rastelli, Massino, Bracco, Martelli, Agar, and Cantatore, aided and abetted by Konovitch, received illegal payments from a unknown hotel furniture installer in violation of 29 U.S.C. § 186(b)(1).

Count 53 alleges that between April 1, 1983, and May 31, 1983, Agar received an illegal labor payoff, a piano, from an employer, Frank Norcisco, in violation of 29 U.S.C. § 186(b)(1).

Counts 54 and 55 allege that on August 23, 1984, Mariani made false material declarations before a grand jury in violation of 18 U.S.C. § 1623(a) and obstructed the grand jury in violation of 18 U.S.C. § 1503.

Count 56 alleges that on January 16, 1984, and April 4, 1985, Konovitch, in violation of 18 U.S.C. § 401, disobeyed the order of the District Court to give testimony before a grand jury.

Count 57 alleges that between May 1, 1983, and July 1, 1983, Bracco, Martelli, Cantatore, and Rosenberg conspired to pay and receive illegal labor and benefit fund payoffs in violation of 18 U.S.C. § 371.

Count 58 alleges that between May 1, 1983, and July 1, 1983, Rosenberg, as owner of Block and Rose, made an illegal labor payoff to Martelli in violation of 29 U.S.C. § 186(a)(2).

Count 59 alleges that between May 1, 1983, and July 31, 1983, Bracco and Martelli, aided by Cantatore, received an illegal employee benefit fund payoff from Rosenberg in violation of 18 U.S.C. § 1954.

Count 60 alleges that between May 1, 1983, and July 31, 1983, Rosenberg made an illegal employer benefit fund payoff in violation of 18 U.S.C. § 1954.

Count 61 alleges that between May 1, 1983, and the date of the filing of the indictment, Bracco, Martelli, Scordato, and Muli conspired to submit false documents to the National Labor Relations Board ("NLRB"), to pay and received illegal labor payoffs, and to commit mail fraud in violation of 18 U.S.C. § 371.

Count 62 alleges that between May 1, 1983, and July 31, 1983, Bracco, Martelli, Scordato, and Muli committed mail fraud in violation of 18 U.S.C. § 1341.

Count 63 alleges that between May 1, 1983, and July 31, 1983, Scordato received an illegal labor payoff from Raintree.

Count 64 alleges that between May 1, 1983, and July 31, 1983, Muli, as owner of Raintree, made an illegal labor payoff in violation of 29 U.S.C. § 186(a)(2).

In addition to the 64 counts, the indictment seeks forfeiture of the interests of P. Rastelli, C. Rastelli, Massino, Bracco, Martelli, Agar, Cantatore, Marangello, Ficarotta, Weissman, and Schwartz pursuant to 18 U.S.C. § 1963.

On January 6, 1986, a different grand jury voted and filed indictment CP–86–00015 (the "Mariani indictment") charging Dominic Mariani with four additional counts. The Mariani indictment was consolidated with indictment CR–85–00354 by order of this Court on January 17, 1986.

Count 1 of the Mariani indictment charges Mariani with participation in the RICO conspiracy alleged in count 1 of the earlier indictment. Count 2 of the Mariani indictment is identical to count 27 of the earlier indictment. Count 3 of the Mariani indictment alleges that between January 1, 1981, and July 31, 1982, Mariani, as owner of Guardian, made an illegal labor payoff in violation of 29 U.S.C. § 186(c)(2). Count 4 of the Mariani indictment alleges that between January 1, 1979, and July 31, 1982, Mariani made an illegal employee benefit fund payoff in violation of 18

U.S.C. § 1954. In addition to these four counts, the Mariani indictment seeks forfeiture of the interests of Mariani pursuant to 18 U.S.C. § 1963.

## SEVERANCE MOTIONS

Several defendants have made severance motions based on arguments of misjoinder of offenses and defendants and prejudice pursuant to Rules 8 and 14 of the Federal Rules of Criminal Procedure. Defendants Agar and Cantatore contend that the substantive counts of the indictment are impermissibly joined together and impermissibly joined with the RICO count. Defendants Agar, Cantatore, and Mariani allege Rule 8(b) misjoinder of the perjury and obstruction charges (counts 54 and 55) against defendant Mariani with the other counts of the indictment. Defendant Muli contends that severance of the counts against him is mandated because the charges against him are not connected to and do not arise out of the conduct of the enterprise alleged in the RICO count. In the alternative, these last four defendants, as well as defendants Weissman and Schwartz, seek discretionary severance pursuant to Rule 14.

### Misjoinder

*Agar and Cantatore.* The basis of defendants Agar and Cantatore misjoinder argument is that the charges contained in the indictment can, according to them, be broken down into separate and discrete clusters of charges—essentially separate conspiracies—involving different groups of defendants, different victims, different time frames, and often different statutory violations.

Rule 8(b) of the Federal Rules of Criminal Procedure, which governs joinder in multiple defendant cases, provides in pertinent part:

"Two or more defendants may be charged in the same indictment ... if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or

more counts together or separately and all of the defendants need not be charged in each count."

■ For purposes of these motions and the 8(b) motions made by the other defendants, the key phrase in Rule 8(b) is "same series of acts or transactions constituting an offense or offenses." It is well settled that this phrase permits joinder of crimes arising out of a common scheme or plan. *United States v. Weisman*, 624 F.2d 1118, 1129 (2d Cir.), *cert. denied*, 431 U.S. 905, 101 S.Ct. 209, 66 L.Ed.2d 91 (1977); *United States v. Bernstein*, 533 F.2d 775, 789 (2d Cir.), *cert. denied*, 429 U.S. 998, 97 S.Ct. 523, 50 L.Ed.2d 608 (1976); *United States v. Clemente*, 494 F.Supp. 1310, 1324 (S.D. N.Y.1980), *aff'd*, 670 F.2d 1069 (2d Cir.), *cert. denied*, 459 U.S. 820, 102 S.Ct. 102, 70 L.Ed.2d 91 (1981). It is equally well established that a conspiracy charge "presumptively satisfies Rule 8(b)," *United States v. Castellano*, 610 F.Supp. 1359, 1396 (S.D. N.Y.1985), because it "provides a common link and demonstrates the existence of a common plan." *Bernstein, supra*, 533 F.2d at 789. Similarly, a RICO conspiracy charge may provide the unifying link among the substantive crimes that form the basis of the pattern of racketeering activity for purposes of their joinder under Rule 8(b). *United States v. Tashjian*, 660 F.2d 829, 833 (1st Cir.), *cert. denied*, 454 U.S. 1102, 102 S.Ct. 681, 70 L.Ed.2d 646 (1981); *Weisman, supra*, 624 F.2d at 1129.

A RICO count itself, "virtually by definition," constitutes "a 'series of acts or transactions' sufficiently inter-related to permit a joint trial of all defendants." *United States v. Bagaric*, 706 F.2d 42, 69 (2d Cir.), *cert. denied*, 464 U.S. 840, 104 S.Ct. 133, 78 L.Ed.2d 128 (1983). As the Second Circuit has observed:

"If . . . the [predicate] acts could properly be considered part of a 'pattern of racketeering activity,' we see no reason why they could not similarly constitute part of a 'series of acts or transactions constituting an offense' within the meaning of Rule 8(b). Indeed, a construction of Rule 8(b) that required a closer relationship between transactions than that necessary to establish a 'pattern of racketeering activity' under RICO might possibly prohibit joinder in circumstances where Congress clearly envisioned a single trial."

*Weisman, supra*, 624 F.2d at 1129.

■ In essence then if the RICO charge itself is valid, an indictment charging the substantive crimes alleged as predicate acts along with the RICO claim satisfies the requirements for valid joinder under Rule 8(b). This Court has concluded that the RICO charge does sufficiently allege a single enterprise. Under the authority cited above, the RICO charge provides the justification under Rule 8(b) to join the substantive charges. *See, e.g., Weisman, supra*, 624 F.2d at 1122 (the acts charged need not be specifically related to each other; it is the enterprise itself that provides the unifying link).

The present case is quite similar to *United States v. Clemente*, 494 F.Supp. 1310 (S.D.N.Y.1980), *aff'd*, 640 F.2d 1069 (2d Cir.), *cert. denied*, 459 U.S. 820, 102 S.Ct. 102, 70 L.Ed.2d 91 (1981), in which multiple defendants were indicted in a single indictment that contained substantive and conspiracy RICO charges, 139 substantive Taft-Hartley and extortion charges, which were also alleged as racketeering acts in the RICO counts, and 18 other miscellaneous substantive offenses and conspiracies, including income tax evasion and perjury charges. In *Clemente*, in response to defendants' allegations of misjoinder on the other ground, similar to those of defendants Agar and Cantatore in the present case, that the indictment alleged a number of separate and discrete sub-conspiracies, the Government made an offer of proof that alleged that the RICO "enterprise had one common objective: the corrupt control and influence over the waterfront industry in the Port of New York and other ports in the eastern United States in order to enrich themselves and their associates." *Id.* at 1316. Based on the Government's representation, Judge Sand denied defendants'

motions before trial. *Id.* At trial and after conviction, defendants renewed their misjoinder contentions, and Judge Sand, after a review of the evidence introduced during the trial, again denied the motions. The court found after trial that defendants had indeed joined together in a common scheme to control and influence an industry and union and to distribute work in order to enrich themselves and selected company owners as alleged in the RICO counts.

Defendants are correct that the indictment and proffer in *Clemente* was more specific in detailing the structure of the enterprise charged than the indictment and proffer in the present case. However, specificity is not really the relevant question. This Court concludes that the Government has met its threshold requirement of alleging an associated-in-fact enterprise, the existence of which provides the "glue" necessary to permit joinder of the substantive charges. Therefore, Agar and Cantatore's motion for severance based on Rule 8(b) is denied.

*Muli.* The basis of defendant Muli's severance motion is that the charges against him are not connected to and do not arise from the conduct of the enterprise alleged in the RICO count in which he is not even charged. Muli argues that the entire "gist" of the indictment and the purpose of the enterprise relates to the alleged involvement of organized crime and Local 814 in the moving and storage industry. Muli contends that neither he nor his company, Raintree, have any connection to organized crime or to the moving and storage industry.

For the following reasons, Muli's motion is denied. Besides moving and storage companies, the indictment defines the enterprise alleged to include employees, owners, and representatives of "other commercial firms located in the New York metropolitan area whose employees were employed in an industry affecting interstate commerce and were represented by and would be admitted to membership in Teamsters Local 814," (Indictment ¶ Id), specifically including Raintree. More important-

ly, the very point of the enterprise alleged is the exercise of the power of Local 814 over those companies whose employees were represented by the Local. Counts 61 through 64 allege a conspiracy in which the union officials enriched themselves by receiving a payoff from Muli, and Muli enhanced his business and enriched himself by making the payoff in exchange for "sweetheart" arrangements. There is no doubt then that the offenses alleged, if proved, arise out of the same pattern of acts and transactions charged throughout the indictment and encompassed by the RICO charge.

*United States v. Bledsoe*, 674 F.2d 647 (8th Cir.1982), *cert. denied*, 459 U.S. 1040, 103 S.Ct. 456, 74 L.Ed.2d 608 (1982), cited by defendant Muli as having "closely analogous facts," is clearly inapposite. In *Bledsoe*, the RICO counts alleged a pattern of racketeering activity involving the fraudulent sale of securities of four agricultural cooperatives. The court concluded that two substantive counts involving the sale of securities of a separate corporation, sales that were not alleged in the RICO counts to be predicate acts of racketeering or overt acts in furtherance of the conspiracy, were misjoined. *Id.* at 655. The court explained that a common modus operandi combined with the presence of one common defendant was not sufficient to permit joinder. The present case is significantly different from *Bledsoe*. Here, most importantly, the acts alleged in the substantive counts are also alleged as predicate Racketeering Acts # 57 (payoff) and # 100 (mail fraud) in which Muli is, according to the Government, an unindicted co-conspirator. It is not the common modus operandi that permits the joinder of counts 61, 62, and 64 with the rest of the indictment but rather the fact that the acts alleged in these counts are part of the activity of the enterprise charged in the RICO count.

Muli's contention that severance is required because he is not charged in the RICO count is also without merit. As Judge Sofaer recently explained,

"even if a defendant is not named in a conspiracy or RICO count, he may be charged to have participated in the same series of acts or transactions that constituted the conspiracy or RICO offense, despite the fact that his participation may have been too limited to permit his being included as a co-conspirator or co-racketeer."

*United States v. Castellano,* 610 F.Supp. 1359, 1396–97 (S.D.N.Y.1985), *citing United States v. Barton,* 647 F.2d 224, 240 (2d Cir.), *cert. denied,* 454 U.S. 857, 102 S.Ct. 307, 70 L.Ed.2d 152 (1981); *Weisman, supra,* 624 F.2d at 1119, 1129. Accordingly, defendant Muli's severance motion is denied.

*Mariani.* Prior to the second indictment of defendant Mariani charging him with participating in the RICO conspiracy as well as having committed related substantive offenses in addition to the false declaration and obstruction of justice counts (counts 54 and 55), defendants Agar, Cantatore, and Mariani moved to sever the false declaration and obstruction of justice charges against Mariani. The defendants' arguments were principally based on the fact that Mariani was then not named in the RICO count or in any other substantive counts. Now that Mariani has been so named, defendants' motions must be denied.

It appears that the same evidence that the Government intends to offer to prove the false declaration and obstruction of justice counts will also be offered to prove Mariani's guilt of the RICO conspiracy and related substantive offenses.[2] Given this commonality of proof, the false declaration and obstruction of justice offenses are adequately connected together for the purposes of Rule 8. *See United States v. Sweig,* 441 F.2d 114, 118–19 (2d Cir.), *cert. denied,* 403 U.S. 932, 91 S.Ct. 2256, 29 L.Ed.2d 711 (1971). *See also Clemente, supra* at 1324, where, citing *Sweig* and *United States v. Issacs,* 493 F.2d 1124, 1158–61 (7th Cir.), *cert. denied,* 417 U.S. 976, 94 S.Ct. 3184, 41 L.Ed.2d 1146 (1974), Judge Sand concluded that a false declaration charge was properly joined to the substantive and RICO counts "because these substantive counts clearly related to and were the subject of the questions involved in the false declaration charges."

### Severance Under Rule 14

Although some of the various defendants making Rule 14 motions have arguments specific to their personal situation, the common contention is that joinder in the present indictment makes it too complicated for the jury to keep separate the evidence related to each charge, thus risking "prejudicial spillover." *See, e.g., United States v. Branker,* 395 F.2d 881, 887–88 (2d

**2.** The Government has made the following proffer of what it expects to prove at trial with respect to defendant Mariani:

"The evidence at trial will be, contrary to his false declarations before the grand jury, that Mariani conspired with the other RICO defendants named in racketeering acts 64 through 82 and in Counts 27 through 45 to make multiple payoffs to union and benefit funds officials and others, in violation of 29 U.S.C. § 186(a)(2) and 18 U.S.C. § 1954, and to commit extortion, in violation of 18 U.S.C. § 1951. Like defendants Weissman and Schwartz, Mariani and another company owner conspired with the other RICO enterprise members to enhance their respective businesses and to enrich themselves through the conduct of the enterprise by making payoffs in order to obtain preferential treatment from the union and to use the union and organized crime members and associates to eliminate competition from non-enterprise employers within the marketplace. The evidence will further show that Weissman, Schwartz, Mariani and another actually met with other RICO conspirators, including, among others, the union officials and Ficarotta, who is identified as an organized crime member. At meetings, each employer discussed and agreed to make payoffs which would be tied to a specified percentage of gross receipts earned by those employers on government moving contracts performed or to pay a flat monthly sum in exchange for the corrupt cooperation of the union, its funds and organized crime. Mariani's denials that he made payoffs and had discussions about payoffs will be proven false by the very same evidence presented to prove the RICO and the related substantive counts."
Government's Memo of Law in Opposition to Defendants' Pretrial Motions, pp. 31–32.

Cir.1968), *cert. denied,* 393 U.S. 1029, 89 S.Ct. 639, 21 L.Ed.2d 573 (1969). Federal Rule of Criminal Procedure 14 provides in pertinent part:

"If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires."

A motion to sever under Rule 14 requires a court to consider all the factors relevant to possible prejudice, as well as the Government's interests in trying the defendants together. *See United States v. Losada,* 674 F.2d 167, 171 (2d Cir.), *cert. denied,* 457 U.S. 1125, 102 S.Ct. 2945, 73 L.Ed.2d 1341 (1982). The Second Circuit has instructed that a trial judge should give proper weight to a demonstration that a proposed severance would cause unfairness, substantial costs, and a danger to witnesses: "the general rule that persons jointly indicted may be jointly tried where the crime charged may be proved against all by substantially similar evidence ... 'conserves judicial resources, alleviates the burdens on citizens serving as jurors, and avoids the necessity of having witnesses reiterate testimony in a series of trials.'" *United States v. Lyles,* 593 F.2d 182, 191 (2d Cir.), *cert. denied,* 440 U.S. 972, 99 S.Ct. 1537, 59 L.Ed.2d 789 (1979), *quoting United States v. Borelli,* 435 F.2d 500, 502 (2d Cir.1970), *cert. denied,* 401 U.S. 946, 91 S.Ct. 963, 28 L.Ed.2d 229 (1971). Thus, to warrant a severance pursuant to Rule 14, a defendant must demonstrate "substantial prejudice from a joint trial, not just a better chance of acquittal at a separate one." *United States v. Fantuzzi,* 463 F.2d 683, 687 (2d Cir.1972).

The Government here has presented a strong case for a joint trial of this indictment. The costs of trying these counts in separate trials would be substantial in terms of time, money, and duplication of effort. This indictment alleges not merely a series of crimes but a single criminal enterprise which had as its objective the accomplishment of the various illegal activities charged as acts of racketeering and as substantive crimes. As the Court of Appeals has noted, the presumption in favor of joint trials is particularly strong where, as here, "the crime[s] charged involved a common scheme or plan." *United States v. Girard,* 601 F.2d 69, 72 (2d Cir.), *cert. denied,* 444 U.S. 871, 100 S.Ct. 148, 62 L.Ed.2d 96 (1979). Moreover, the Government alleges that considerable danger exists in connection with any severance that would require the Government to call the same witnesses to testify at separate trials. The Government contends that, once the identities of the witnesses became known at a separate trial, the threat to their safety would "become immediate and the risk of retaliation against the witnesses to prevent them from testifying at a subsequent trial would be great."

On the other hand, the risk of jury confusion appears significantly overstated by defendants. As Judge Weinfeld wrote in an often-cited opinion, *United States v. Kahaner,* 203 F.Supp. 78, 81–82 (S.D.N.Y. 1962), *aff'd,* 317 F.2d 459 (2d Cir.), *cert. denied,* 375 U.S. 836, 84 S.Ct. 62, 11 L.Ed.2d 65 (1963):

"The ultimate question is whether under all the circumstances of the particular case, as a practical matter, it is within the capacity of the jurors to follow the court's admonitory instructions and accordingly to collate and appraise the independent evidence against each defendant solely upon that defendant's own acts, statements and conduct. In sum, can the jury keep separate the evidence that is relevant to each defendant and render a fair and impartial verdict as to him? If so, though the task be difficult, severance should not be granted."

Here, the predicate acts and substantive charges can easily be broken down into distinct and readily identifiable areas of criminal activity. A variety of aids such as charts and verdict forms will be used to help the jury proceed in an orderly manner

through the many charges and should eliminate confusion in reaching individual verdicts.

There has been no showing that a jury will be unable to compartmentalize the evidence as it pertains to each defendant. Rather, since the crimes alleged are conceptually quite simple and represent discrete acts, there is every reason to believe the jury could compartmentalize the evidence. In short, this Court sees no substantial risk of prejudice resulting from the fact that this is a large case and sees no reason to stray from the general rule allowing the Government to try large numbers of defendants together. *See, e.g., United States v. Moten,* 564 F.2d 620, 626–28 (2d Cir.), *cert. denied,* 434 U.S. 942, 98 S.Ct. 438, 54 L.Ed.2d 304 (1977); *United States v. Shipp,* 578 F.Supp. 980, 995–96 (S.D.N.Y.1984).

Defendants Muli, Weissman, and Schwartz further contend that their involvement in the alleged enterprise is so minimal that they will be substantially prejudiced by joinder of the charges against them with the charges in the rest of the indictment. *See, e.g., United States v. Branker, supra.* Similarly, defendants argue that the small portion of evidence that may be offered against them will be overwhelmed by that introduced against the other defendants, resulting in the jury improperly associating Weissman, Schwartz, and Muli with the larger scheme and lengthier time period involved in the other charges in which they are not named. *See, e.g., United States v. Mardian,* 546 F.2d 973, 977 (D.C.Cir.1976). However, without more, such arguments do not provide grounds for separate trials. As the Second Circuit noted, "differing levels of culpabilities and proof are inevitable in any multi-defendant trial, and standing alone, are insufficient grounds for separate trials." *United States v. Carson,* 702 F.2d 351, 367 (2d Cir.), *cert. denied,* 462 U.S. 1108, 103 S.Ct. 2456, 77 L.Ed.2d 1335 (1983). Just

because the proof against all defendants is not equal and one or more defendants would have had a better chance for acquittal if tried separately is no reason to grant severance. *United States v. DiPasquale,* 561 F.Supp. 1338, 1348 (E.D.Pa.1983), *aff'd,* 740 F.2d 1282 (3d Cir.1984), *citing United States v. Somers,* 496 F.2d 723, 730 (3d Cir.), *cert. denied,* 419 U.S. 832, 95 S.Ct. 56, 42 L.Ed.2d 58 (1974); *United States v. DeLarosa,* 450 F.2d 1057, 1065 (3d Cir. 1971). In the present case the Court believes that the simple and discrete nature of the crimes charged, combined with jury instructions designed to prevent a spillover effect, will prevent the risk of prejudice feared by defendants.[3]

Defendant Weissman argues further that severance of the counts against him is appropriate because his defense may be to attack the organized crime defendants and the union defendants as extortionists. At trial, Weissman's counsel says he may argue that he was never a part of the enterprise alleged and that his failure to make the payments alleged could have resulted in a severe financial loss to his business and in violence to his business property. Such a defense, if presented, could well create a level of antagonism that would compel severance. Thus, for example, in *United States v. Berkowitz,* 662 F.2d 1127, 1134 (5th Cir.1981) [cited with approval in *United States v. Carpentier,* 689 F.2d 21, 27–28 (2d Cir.1982), *cert. denied,* 459 U.S. 1108, 103 S.Ct. 735, 74 L.Ed.2d 957 (1983) ], the court explained that, "the defense of a defendant reaches a level of antagonism (with respect to the defense of a co-defendant) that compels severance of that defendant if the jury, in order to believe the core of testimony offered on behalf of that defendant, must necessarily disbelieve the testimony offered on behalf of his co-defendant. In such a situation, the co-defendants do indeed become the Government's best witnesses against each other." Here, how-

---

**3.** Such jury instructions should also protect defendants from any prejudice that might result from evidence of organized crime links to other defendants. See also the discussion of the allegations of inflammatory and prejudicial language in the indictment.

ever, the combination of the tentativeness of Weissman's position—the contention only that this antagonistic defense might be presented—with the failure of Weissman to articulate any plausible set of facts that would make out a prima facie defense of duress compels this Court to reject Weissman's argument.

Finally, defendants Agar, Cantatore, and Mariani argue that joinder of the false declaration and obstruction of justice counts against Mariani results in substantial prejudice. The Second Circuit, though, has recently rejected a Rule 14 motion made in similar circumstances:

> "Finally, [defendant] argues that he suffered substantial prejudice by the district court's refusal to sever the counts charging him with false statements, perjury, and obstruction of justice. The law in this circuit clearly supports the joinder of underlying substantive crimes with perjury counts where, as here, the false declarations concern the substantive offenses. The contention that there is some inherent prejudice in joining perjury and related counts with substantive offense charges has been widely rejected. Thus, Judge Weinfeld did not abuse his discretion in denying [defendant's] motion to sever these counts."

*United States v. Potamitis*, 739 F.2d 784, 791 (2d Cir.1984) (citations omitted).

■ Mariani further contends that he would be prejudiced because co-conspirator statements admitted to prove the RICO charge will be impermissibly used to prove the perjury charge against him as well, *citing United States v. Cambindo Valencia*, 609 F.2d 603 (2d Cir.), *cert. denied*, 446 U.S. 940, 100 S.Ct. 2163, 64 L.Ed.2d 795 (1980). A similar argument, though, was rejected in *United States v. Sweig*, 441 F.2d at 118–19, when the court noted the clear connection between the conspiracy charge and perjury charges and the commonality of proof.[4] It is clear that in the

present case proof of the RICO charge and the other substantive charges in which Mariani is involved will be admissible to show the falsity of Mariani's statements. *Cambindo Valencia* simply holds that hearsay statements in furtherance of separate uncharged conspiracy would not be admissible. *Cambindo Valencia*, 609 F.2d at 635–36 n. 25. Here, any co-conspirator statements offered at trial will be those which were uttered in furtherance of the conspiracy charged in the RICO counts which was allegedly participated in by Mariani. Evidence of Mariani's participation in that conspiracy would be evidence of his guilt of perjury and obstruction of justice. Therefore, the motions to sever the false declaration and obstruction of justice counts are denied.

## MOTIONS TO DISMISS

■ *Agar and Cantatore.* Defendants Agar and Cantatore move to dismiss the RICO count because, they argue, it fails to allege a single enterprise. Agar and Cantatore contend that there is no single association-in-fact alleged but rather that the RICO count alleges the existence of numerous separate organizations (a crime family, a union, union benefit funds, separate companies) without pleading a sufficient link between the organizations to establish the existence of a single enterprise. In response the Government has made the following proffer of what it expects to prove at trial in order to establish the existence of a single associated-in-fact enterprise comprised of members from different segments who coalesced in an ascertainable structure to conduct the affairs of the enterprise for their mutual benefit:

> "Testimony from co-conspirators will prove that defendants from the different levels of the enterprise—union, organized crime and corporate officials—actually sat down at meetings together and in different combinations to conduct the affairs of the enterprise and to plan the

---

4. The court in *Sweig* did note that, while the district court denied the Rule 14 severance motion pre trial, it was not asked to renew its consideration of the motion. Still, under the

circumstances, the Second Circuit refused to find plain error under Rule 30 and affirmed. 441 F.2d at 120.

commission of the predicate acts and substantive offenses charged in the Indictment, all of which were committed to achieve their mutual objectives. For example, evidence will show that Philip Rastelli, who was in jail during a portion of the relevant period of time, sent orders from jail through his brothers, particularly defendant Carmine Rastelli, which orders were carried out by other members of the enterprise, both union officials and company owners. The defendants, it will be shown, actually sat down at meetings to settle disputes among enterprise members and to discuss the payment, collection and distribution of payoffs from and to members of the enterprise and the monopolization of government moving contracts. The structure, organization and conduct of the enterprise charged, although less formal and without the trappings of the stately board rooms and corporate minutes of a legitimate corporate enterprise, certainly operated as a 'continuing unit' under 'common control' to achieve common objectives. *United States v. Turkette*, 452 U.S. 576, 583 [101 S.Ct. 2524, 2528, 69 L.Ed.2d 246] (1981)."

Government's Memo of Law in Opposition to Defendants' Pretrial Motions, p. 22. It seems clear that such an association-in-fact, if proved, would be sufficient to meet the "enterprise" requirement of RICO. By alleging a common purpose shared among individuals who functioned together as a continuing unit, the indictment, on its face, sufficiently alleges the existence of an enterprise under the RICO statute. The Supreme Court made clear in *United States v. Turkette* that a legally sufficient enterprise is one with "an ongoing organization, formal or informal," in which "the various associates function as a continuing unit." Thus, for example, in *United States v. Mazzei*, 700 F.2d 85, 89 (2d Cir.), *cert. denied*, 461 U.S. 945, 103 S.Ct. 2124, 77 L.Ed.2d 1304 (1983), the Second Circuit concluded that a group of organized crime associates and basketball players who shared a common purpose—illegally shaving points in basketball games to maximize

successful betting—and functioned as a continuing unit constituted an "enterprise." *See also United States v. Errico*, 635 F.2d 152, 155 (2d Cir.1980), *cert. denied*, 435 U.S. 911, 101 S.Ct. 3142, 69 L.Ed.2d 994 (1981); *United States v. Huber*, 603 F.2d 387, 394 (2d Cir.1979), *cert. denied*, 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980); *United States v. Campanale*, 518 F.2d 352 (9th Cir.1975), *cert. denied*, 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 638 (1976).

Moreover, although the Eighth Circuit has concluded that the enterprise alleged in a RICO charge must have an existence that can be defined apart from the commission of the predicate acts constituting the alleged pattern of racketeering activity, *see, e.g., United States v. Lemm*, 680 F.2d 1193, 1198–1201 (8th Cir.1982); *United States v. Bledsoe*, 674 F.2d 647, the Second Circuit has explicitly rejected this analysis and concluded that proof of the pattern of racketeering may "coalesce" with proof of the enterprise. *United States v. Mazzei*, 700 F.2d at 89.

Therefore, since the RICO charge in the present case on its face alleges an association-in-fact functioning as a continuing unit with an ascertainable structure, this Court cannot now dismiss the count. Of course, if the Government cannot prove the existence or organization of the enterprise as described in its proffer, dismissal of the RICO count at a later date will be required.

*Bracco and Martelli.* Defendants Bracco and Martelli have moved to dismiss the indictment or in the alternative for severance, a bill of particulars, and striking of prejudicial language in the statement of charges. The motion has three prongs.

First, Bracco and Martelli argue that the indictment should be dismissed because it is not "plain" and "concise" as required by F.R. Crim.P. 7(a). The basis of defendants' argument is that, "when the allegations of the indictment are unravelled, one sees not a cohesive, unified whole but a smorgasbord of criminal acts loosely, if at all, connected." *United States v. Bertolotti*, 529 F.2d 149, 151 (2d Cir.1975). The Govern-

ment correctly characterizes this contention as "truly one that argues misjoinder." Essentially, defendants Bracco and Martelli's motion, like that of Agar and Cantatore, argues that the indictment does not charge a single associated-in-fact enterprise. This argument has already been discussed and rejected by this Court.[5]

Bracco and Martelli also argue that the indictment should be dismissed because it is so devoid of necessary specifications as to make it not sufficiently "definite" as required by F.R. Crim.P. 7(a). It is clear that the specificity standard is a liberal one. *See, e.g., United States v. Carrier,* 672 F.2d 300, 303 (2d Cir.), *cert. denied,* 457 U.S. 1139, 102 S.Ct. 2972, 73 L.Ed.2d 1359 (1982). As the Second Circuit explained in *United States v. Trotta,* 525 F.2d 1096, 1099 (2d Cir.1975), this Circuit "has constantly sustained indictments which track the language of a statute and, in addition, do little more than state time and place in general terms." This Court has already granted defendants additional discovery and bill of particulars in a Memorandum and Order dated January 16, 1986, which makes the charges against them "sufficiently specific to enable the defendant to prepare a defense." *Carrier,* 672 F.2d at 303. Further detail is not required.

Finally, defendants Bracco and Martelli contend that the indictment should be dismissed because it contains inflammatory and prejudicial language and allegations. This contention is discussed hereinafter.

## MINIMIZATION

Defendant Frank Muli, owner and officer of Raintree, who is not charged in the RICO count but has been indicted for conspiracy to defraud, to receive and pay labor payoffs, and to commit mail fraud (count 61), mail fraud (count 62), and the payment of labor payoffs (count 64), moves to suppress the Government's interception of a conversation on May 12, 1983, in which defendant Muli participated on the ground that the Government failed to minimize properly the interception of non-pertinent conversations. In the alternative, defendant requests a hearing to determine whether proper minimization procedures were followed. Because the Government has shown that its agents properly minimized interceptions on May 12, defendant's motion to suppress or for a hearing is denied.

The disputed conversation occurred between 2:14 and 2:27 p.m. on May 12 in the Teamsters Local 814 office of co-defendant James Vincent Bracco and involved not only Muli and Bracco but also co-defendant Charles Martelli and alleged co-conspirator John Scordato, now apparently deceased. The conversation was intercepted pursuant to the April 29, 1983 order of U.S. District Judge Henry Bramwell authorizing the interception of oral communications by the installation of a microphone in the office of Bracco for a period not to exceed 30 days.[6] Accordingly, monitoring began on May 3, 1983, at a little after 4:00 p.m. Only Brac-

---

**5.** Furthermore, the Government makes the following proffer of what it expects to prove at trial which would establish the "cohesive, unified whole" required by *Bertolotti:*

"The defendants, often led by Bracco and Martelli, conducted the enterprise for the corrupt purpose of using, dominating, and controlling the union and its benefit funds to make money illegally. As we have said before in response to Agar and Cantatore's identical complaint, the number of employers who were extorted and who made payoffs is overwhelming and widespread, but that observation supports, rather than argues against, this Indictment as it is presently constituted. The sheer number of payoffs and companies involved over a twenty-year period, while Bracco and Martelli had the power to shape union affairs, proves the Indictment's critical allega-

tion that this enterprise and Bracco and Martelli, in particular, sought to, and did, dominate, control and influence a union and an industry to make money for themselves illegally.

"All of the crimes alleged in the Indictment were committed in furtherance of a plan repeated over and over again by defendants Bracco and Martelli to abuse their position in such a way as to earn money for themselves and their co-racketeers and the ensure their continued ability to do so."

Government's Memo of Law at 51.

**6.** The Court also authorized the installation of both an audio and video recorder in defendant Charles Martelli's union office for a period of 30 days.

co and Martelli themselves were named as authorized interceptees. On May 6 and May 13, the Government submitted its first and second monitoring reports of the Bracco and Martelli operations to Judge Bramwell, who granted their request for continued interception. On May 27, 1983, the operations were terminated.[7]

Defendant Muli seeks to suppress the May 12 conversation first on the ground that the Government listened to the conversation well beyond the point at which lack of pertinence became apparent, thus violating the requirement of Title III of the Omnibus Crime Control and Safe Streets Act of 1968 that surveillance "be conducted in such a way as to minimize" the interception of non-pertinent communications. 18 U.S.C. § 2518(5). Defendant Muli argues next that the minimization requirement was violated because the proportion of pertinent interceptions to non-pertinent interceptions was so low before May 12 that the surveillance should have been discontinued before the interception of the Muli conversation. Finally, defendant Muli requests a hearing to clarify supposedly conflicting evidence concerning the Government's minimization efforts. In particular, it is argued that the Government has not disclosed how many interceptions occurred prior to the Muli conversation nor clarified an apparent discrepancy between the Government logs and monitoring report on the one hand which describe the disputed conversation as lasting for 13 minutes, and the audio tape itself on the other which apparently lasts over 50 minutes.

■ Defendant's first "non-pertinence" argument fails because the Government agents' conduct in intercepting this conversation was reasonable in light of the circumstances of the surveillance and investigation conducted in this case. Such an ad hoc determination of reasonableness on a conversation-by-conversation basis was the standard for the minimization requirement announced in *Scott v. United States*, 436

U.S. 128, 135–43, 98 S.Ct. 1717, 1722–26, 56 L.Ed.2d 168 (1978).

The transcript of the May 12 conversation, which is marked with stop-watch readings showing elapsed time, reveals that from the beginning of the interception the speakers were talking about union affairs in a manner which, at best, could be described as irregular. Defendant Martelli began, announcing, "we got the method of which we are going to proceed." Bracco responded immediately with a warning that "the one fear that we gotta always overcome" is the risk that someone will "go to the labor board" to complain. Bracco then instructed Muli:

> "I'm gonna give you 35 names. Alright, you put them in the payroll book.... Don't pay.... Just 35 names. So if anybody looks, you show them that book, that they were on your payroll. You put them on. You backdate them 2, 3 weeks, okay, you know, from when we want to start the contract...."

Meanwhile, Muli has interjected his agreement:

> "Okay. Right. We should go back at least a couple of weeks, I think....
> "You tell me. Whichever way. You know I'm ... I'll do it ... I'll do it any way that's gonna make it easier...."

Transcript at 1.

This discussion, apparently about the creation of a back-dated payroll record continued for the first 3 minutes of the 13 minute interception. Without deciding whether the beginning of this conversation was criminal in nature, the Court can easily determine that it was sufficiently irregular that the monitoring agent could have reasonably believed that it was pertinent to a prosecution for fraud arising out of the conduct of labor affairs. The initial decision to intercept the conversation thus was justifiable and did not run afoul of the minimization requirement.

---

7. There was also a second round of interception of conversations at Bracco's and Martelli's offices pursuant to court order of June 20, 1983, spanning the period June 20, 1983, through July 19, 1983.

Moreover, the monitoring agent's decision to continue to tape the conversation for almost 13 minutes was also proper because he reasonably could have believed that the conversation would continue to be pertinent during this period of time. After the discussion above, the next 5 minutes of the conversation involved union affairs in which the union leaders, Bracco and Martelli, appeared to be promoting the interests of the employer Muli over those of the union members. For example, during a discussion of setting a starting date for the beginning of the collective bargaining agreement, Bracco appeared to suggest a starting date that would be favorable to employer Muli.

> "Now if you start the contract, and it expires July 1, if they drag you out one month, you're into your busy season and then you're (inaudible). If they strike you then you're dead. You should have the contract start where ... you run into your ... when its slow and it runs into your busy season...."
> *Martelli:* "We're gonna protect as much as you want, but we have to look at the worst that can happen."
> "... We hardly never talk about strike...."

Shortly thereafter, upon Bracco's suggestion, the parties can be heard agreeing to a "sweetheart" May 1 contract starting date which, they stated, would give Muli several months to "play around" in contract negotiations before the start of his busy season. Tr. at 5–6.

This conversation was immediately followed by Bracco and Martelli's promises to identify ardent unionists and their encouraging of Muli to fire them, regardless of the quality of their work: *Bracco:* "Our guy will come around and he'll tell you get rid of that guy, get rid of this guy because we (inaudible) ... you know our guy, agent, will see the ballbreaker. Even Johnny [Scordato], whoever it is, they'll tell you get rid of this guy ... and we'll try to control it as much as we possible could...." *Scordato:* "... Out! Out!

Get rid of all the cancer! ... And I don't care if she's your best operator. She's gotta go...." *Muli:* No problem.... I've done that before.... I've gotten rid of the best...." Tr. at 7.

Discussions like these in which union leaders appear to be actively promoting the interests of the employer over those of their members are sufficient to raise reasonable suspicions that illegal conduct like labor racketeering or fraud is occurring. The conversations thus are pertinent. In the last 4 minutes of the interception, however, the discussion turned to a new topic apparently concerning the imminent closing of Muli's brother's business and the problem of dealing with the workers that would be let go. The conversation included some suspicious portions, such as Bracco's advice to Muli in dealing with those who are laid off. *See* Tr. at 12. Even if this last section were not considered pertinent, however, its inclusion would not be enough to show improper minimization in light of the previous 8 or 9 minutes of pertinent conversation already discussed. As the court noted in *United States v. Schwartz*, 535 F.2d 160, 164 (2d Cir.1976), *cert. denied*, 430 U.S. 906, 97 S.Ct. 1175, 51 L.Ed.2d 581 (1977), "[i]t is virtually impossible to completely exclude all irrelevant matter from intercepted conversations." Rather, it is enough that the monitoring agent here ended the interception soon after a question about pertinence arose. Such conduct constitutes proper minimization under Title III.

Muli also argues that the Government violated the minimization requirement in a second way, by failing to discontinue entirely the surveillance of Bracco's office before May 12 in light of the extremely low percentage of relevant calls intercepted up to that time. Defendant points to the Government's own statistics submitted to Judge Bramwell on May 13 as part of its "second monitoring report." The statistics for the surveillance of Bracco's office can be summarized as follows:[8]

---

**8.** The report also provides statistics regarding

the audio and video surveillance of Martelli's

| | 5/3 | 5/7 | 5/8 | 5/9 | 5/11 | 5/12 |
|---|---|---|---|---|---|---|
| No. of Interceptions: | 42 | 11 | 12 | 21 | 24 | 33 |
| No. of Pertinent Interceptions: | 0 | 0 | 0 | 0 | 2 | 3 |

Because only two of the 111 interceptions made through May 11 involved pertinent conversations, defendant argues, minimization was not achieved, and the surveillance should have been discontinued before the May 12 conversation in dispute.

■■■■■ Defendant errs first in characterizing his argument as a minimization argument. A defendant claiming violation of the minimization requirement seeks suppression of a particular conversation that was supposedly improperly intercepted; the defendant who is successful in making this argument is entitled to suppression of those conversations but not necessarily to the complete discontinuance of the surveillance, as suggested by defendant. *See, e.g., United States v. Scott,* 436 U.S. 128, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1977); *United States v. Rizzo,* 491 F.2d 215 (1974). Indeed, the surveillance properly could be conducted as long as it was authorized by a valid warrant issued by a neutral judicial officer, *see Katz v. United States,* 389 U.S. 347, 351–53, 88 S.Ct. 507, 511–12, 19 L.Ed.2d 576 (1967), and it could continue throughout the time span authorized in the warrant as long as the underlying probable cause had not grown stale. *See Sgro v. United States,* 287 U.S. 206, 210–11, 53 S.Ct. 138, 140, 77 L.Ed. 260 (1932). By arguing that the monitoring agents acted improperly in continuing to conduct any surveillance when they had only collected two pertinent out of 111 conversations up to that point, Muli appears to argue that by May 12 the probable cause underlying the order of Judge Bramwell had grown stale.[9]

■■■■ Such an argument, however, must fail for several reasons. First, there was a judicial determination that probable cause had not grown stale shortly before May 12. On May 6, the monitoring agents had submitted their first interim report on the conduct of the surveillance to Judge Bramwell, who had granted permission for continued interception. Such a decision presumably is based upon a finding that probable cause existed as of that time. *See United States v. Dorfsman,* 542 F.Supp. 345, 362–63 (N.D.Ill.1982).

Second, defendant's exclusive reliance on the numbers of interceptions without consideration of the surrounding circumstances of the underlying criminal investigation has been eschewed as a method for judging the reasonableness of the conduct of monitoring agents. *See United States v. Scott* 436 U.S. at 140, 98 S.Ct. at 1724; *United States v. Clemente,* 482 F.Supp. at 109. The Court has noted particularly that, "when the investigation is focusing on what is thought to be a widespread conspiracy, more extensive surveillance may be justified." *Scott,* 436 U.S. at 140, 98 S.Ct. at 1724. The present alleged RICO conspiracy involving multiple co-defendants and various allegations of different racketeering activity is an example of such a widespread conspiracy.

Finally, the Supreme Court has noted that during the early stages of surveillance agents may reasonably intercept more communications in order to establish categories of non-pertinent conversations and may thus reasonably intercept a higher percentage of non-pertinent calls than would be reasonable later on in the investigation. *See Scott,* 346 U.S. at 141, 98 S.Ct. at 1725.

---

office. *See* Second Interim Report.

**9.** A possible minimization argument relating to surveillance of calls other than the May 12 call would also raise standing problems unless Muli showed either that he participated in the calls or owned the premises. *See Alderman v. United States,* 394 U.S. 165, 176–80, 89 S.Ct. 961, 968–70, 22 L.Ed.2d 176 (1969). Such a case has not been made out here.

In the present case the disputed conversation occurred only two weeks after the original order was signed on April 29, 1983, authorizing surveillance over a 30–day period. There was also a second round of surveillance between June 20 and July 19, 1983. The first round of surveillance began at 4:00 p.m. on Tuesday, May 3, and less than six working days later, on Wednesday, May 11, the first pertinent conversation was intercepted. In light of the breadth of the alleged conspiracy, six days of surveillance would constitute the early stages of the investigation in which it would be reasonable to intercept a high percentage of non-pertinent calls. Defendant's exclusive reliance on numbers thus would not justify termination of the surveillance.

Defendant's final argument is that a hearing is necessary to clarify alleged gaps and inconsistencies concerning the surveillance conducted on May 12. In particular, defendant contends that the Government has not disclosed how many interceptions occurred prior to the Muli conversation nor clarified why the Government logs and monitoring report describe the disputed conversation as lasting 13 minutes while the audio tape itself actually lasts over 50 minutes.

█ In response to these arguments, the Government has submitted now a detailed explanation of the May 12 surveillance which appears to answer adequately all of the defendant's present concerns about the conduct of the agents on that day. Included in the submission is a complete set of logs which identifies the length of each interception and when it occurred and summarizes the contents of the conversation overheard. These logs reveal that there were 22 interceptions before the conversation at issue and that roughly 18 of these were merely "click ons," i.e., very brief interceptions lasting only a minute or so and conducted to determine the presence and nature of any activity in the surveilled area. The logs also reveal that the approx-

imately 13 minute conversation in dispute is actually only the first segment of the five segments of conversations recorded that day, which last in total approximately 40 minutes. The Government has verified the timing descriptions provided in the logs by independently reviewing the audio tape and checking the transcripts while operating a stop-watch. The transcript of the May 12 conversation that the Government submitted with the logs is marked with the stop-watch readings. This procedure demonstrated that, with the exception of an apparent scrivener's error,[10] there were no real discrepancies between the time noted in the log and the actual tape itself. Absent a further showing of uncertainty as to the conduct of the agents on May 12, a hearing on the issue is unnecessary and thus denied.

Because the present record shows that the Government agents acted reasonably in conducting their surveillance on May 12, the defendant's motion to suppress its results is denied.

## EVIDENTIARY ARGUMENTS

Defendants Bracco, Martelli, and Agar have moved to exclude certain evidence against them as irrelevant under Fed.R. Evid. 401 or as unfairly prejudicial under Fed.R.Evid. 403. Because the balancing of prejudice against the probative value of such evidence cannot be done effectively in advance of trial, defendants' motions are denied without prejudice to their renewal at trial.

Defendants Bracco and Martelli seek to exclude two types of evidence: (1) evidence concerning an illegal 1982 shooting of proposed Government witness Anthony Giliberti and his placement in the witness protection program, and (2) evidence of allegedly intimate relationships between a Francine Benatti and Martelli and between a Margaret Kuhn and Bracco.

The evidence about Giliberti is challenged first as failing to meet the relevance

---

**10.** The Government concedes that the logs' notation "2:23 p.m." for commencement of segment 2 is in error and should actually read "2:33 p.m."

standard of Rule 401 since the crime is not claimed to be related to any of the crimes charged in the present indictment. Second, the defendants argue that the Giliberti testimony should be excluded as unfairly prejudicial under Rule 403, because the assault on Mr. Giliberti was "a highly dramatic event likely to arise great sympathy for the witness." Accordingly, defendants argue that this evidence will be prejudicial according to the standard announced in *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir.1980), as "tend[ing] to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence." Finally, defendants challenge the admissibility of the testimony of Francine Benatti and Margaret Kuhn as irrelevant to the prosecution of defendants Bracco and Martelli for, *inter alia*, RICO violations, receipt of labor payoffs, extortion, conspiracy, and mail fraud and as unfairly tending to excite emotions against the defendants.

Defendant Agar's exclusion motion pursuant to Rule 403 concerns statements that an FBI agent attributes to Agar concerning his alleged receipt of a piano as a payoff from an employer named Frank Narcisso [11] and his alleged extortion of $10,000 from a company known as Steven's Appliances.[12] Agar argues that, because Agent Stone did not accurately record his statements, allowing Stone to testify to them will badly mislead the jury. The prejudice is compounded, defendant argues, by the fact that the only person capable of "setting the record straight" is Agar himself. As a result, the admission of Stone's testimony will, it is argued, compel defendant to testify, in violation of his fifth amendment privilege.

It is generally recognized in this Circuit that a court "cannot adequately assess either the probative value or the potential prejudice of the statements" at a pre-trial stage of the proceedings. *United States v. Anderson*, 575 F.Supp. 31, 33 (S.D.N.Y. 1983); *see also Friedman v. National*

*Presto Industries*, 566 F.Supp. 762, 766 (E.D.N.Y.1983). It is only during trial that "the nature and extent of the Government's proof and how the Government intends to use the statements in question will be clearer and will enable [the] court to better perform the balancing process contemplated by Rule 403." *Anderson*, 575 F.Supp. at 33.

This general rule applies to the present motions to exclude under Rule 403. The Government's description of how it intends to use the Giliberti evidence suggests the sorts of difficulties faced in considering Rule 403 motions to exclude in advance of trial. In opposing defendants Bracco and Martelli's motion, the Government has stated that it "will not inquire of Anthony Giliberti, on direct examination, relative to the shooting assault upon him on July 12, 1982, unless events occurring in the portion of the trial prior to Mr. Giliberti's direct testimony warrant such inquiry. In any event, we will notify this Court prior to commencement of any inquiry along that line during direct." Government's Memo of Law at 80. Clearly, at this stage, the Government's cannot be compelled to be more definitive. And, as a result, the Court cannot now engage in a balancing of the potential prejudice of Giliberti's testimony against its probative value.

A similar conclusion must be reached with regard to the Benatti-Kuhn testimony and that of Agent Stone. The Government states that it intends to use the Benatti-Kuhn testimony to establish the fact that the women received significant sums of money and things of value while defendants Bracco and Martelli were supposedly on fixed incomes prohibiting such levels of expenditures. While such testimony may well be relevant, as the Government suggests, to establish the existence of an illegal slush fund and the defendant's acceptance of money from it, it is difficult to ascertain now the value of this evidence when balanced against the prejudice it may

---

**11.** Agar is charged with accepting this payoff in Racketeering Act # 98 of count 1 and count 53.

**12.** Agar is charged with this extortion in Racketeering Act # 96(a) of count 1.

cause defendants. Likewise, since Agar acknowledges that his argument involves not a constitutional suppression issue but rather the balancing of prejudice and probativeness under Rule 403, *see* defendant's brief at 1, a decision on this issue now would be premature. Agar has hardly demonstrated that Stone's account of his statement is incredible as a matter of law.

### MOTION TO DISMISS FOR LACK OF VENUE

Defendant Agar moves to dismiss for lack of venue Packeteering Act # 95, which charges him with conspiring with defendants Bracco and Martelli to commit arson.

Agar states that, because Gold Service Motors is located in White Plains, which comes within the jurisdiction of the Southern District, venue over this racketeering act does not properly lie in the Eastern District and the racketeering act must, therefore, be dismissed. Acknowledging that, for conspiracy, venue properly lies wherever the agreement or overt act occurred, *see* defendant's brief at 20, Agar argues that a RICO charge is distinguishable from a conspiracy charge in several respects. First, in a RICO charge, defendant argues, each predicate act is an indispensable component of the crime. Thus, in *United States v. Ruggiero*, 726 F.2d 913, 922–23 (2d Cir.), *cert. denied*, 469 U.S. 831, 105 S.Ct. 118, 83 L.Ed.2d 60 (1984), the court strongly encouraged trial courts to require juries to render verdicts on every racketeering act so as to avoid an "automatic retrial" whenever "a defect affecting a single predicate act is later discovered." Second, unlike the overt acts in a conspiracy charge, defendant argues, each racketeering act must comply with an elaborate statute of limitations. Finally, defendant argues that, where as most conspiracy charges need not even list an overt act, racketeering acts meeting specially prescribed requirements must be both alleged and proven in a RICO case. Such distinctions, defendant concludes, demonstrate that different venue rules are appropriate for conspiracy and RICO charges.

Even assuming, without deciding, that the Government must establish that venue properly lies in the Eastern District for each individual racketeering act in count 1, as defendant argues, the defendant's argument fails because defendant mischaracterizes the nature of Racketeering Act # 95 as arson rather than what it actually charges, conspiracy to commit arson. Although defendant may be correct in arguing that venue for an arson prosecution properly lies where the burned building is located, venue for conspiracy properly lies wherever the overt act or the agreement to conspire took place, as defendant himself acknowledges. *See, e.g., Braun v. Elliot*, 225 U.S. 392, 400–02, 32 S.Ct. 812, 815, 56 L.Ed. 1136 (1911); *Hyde v. Shine*, 199 U.S. 62, 76–77, 25 S.Ct. 760, 761, 50 L.Ed. 90 (1905). Racketeering Act # 95 alleges that the conspiracy occurred "in the State of New York," which could include the Eastern District, and the Government's opposition papers claim further that the Government will prove that acts in furtherance of the conspiracy took place within the Eastern District. The Government has offered to provide a bill of particulars setting forth these facts and is hereby directed to do so. Defendant's motion is accordingly denied.

### MOTIONS TO STRIKE SURPLUSAGE

Defendants Bracco, Martelli, and Muli move pursuant to F.R.Crim.P. 7(d) to strike surplusage from counts 1 and 61 of the indictment. In particular defendants Bracco and Martelli, who are among the many defendants charged in count 1, object to the allegations concerning defendants' "association" with an alleged organized crime family, because they are "clearly intended to [incite] prejudice against the defendants." Muli, who is not charged in count 1 but only in counts 61, 62, and 63 of the indictment, moves to strike count 61's incorporation by reference to paragraphs 1(b), 4(f) and 4(g) of count 1 as a "prejudicial form of 'bootstrapping' by which [the Government] is attempting to place before the grand jury a specie of other crimes ...

with which Muli is not charged." Muli also objects to the following four categories of "objectionable" terms in count 1: (1) terms that unduly tend to suggest the defendants are part of "organized crime," (2) nicknames and aliases that are irrelevant to the issues presented in the case and which convey negative images, (3) information properly included in the indictment which is of no relevance to the issues in the case, and (4) information that is purely narrative, refers to none of the defendants or anyone connected to the indictment and is prejudicial. He does not specify particular paragraphs or phrases in each category that should be stricken but merely provides two examples of prejudicial language, "capo" and "underboss" or "boss." As a result, this discussion will consider the motion with regard to these phrases plus the allegations of association with organized crime and the defendants' nicknames.

Courts in this circuit have held that "[a] motion to strike surplusage will be granted only where it is clear that the allegations are not relevant to the crime charged, and are inflammatory and prejudicial." *United States v. DePalma*, 461 F.Supp. 778, 797 (S.D.N.Y.1979), *see also United States v. Pilnick*, 267 F.Supp. 791, 795 (S.D.N.Y. 1967); *United States v. Chas. Pfizer & Co.*, 217 F.Supp. 199, 201 (S.D.N.Y.1963). This standard has been described as "exacting" and, therefore, "only rarely" satisfied. *DePalma*, 461 F.Supp. at 797. Furthermore, it has been held that, although both relevancy and prejudice are pertinent considerations under a Rule 7(d) motion to strike, "if evidence of the allegation is admissible and relevant to the charge, then regardless of how prejudicial the language is, it may not be stricken." *DePalma, su-*

*pra* at 797. Under these stringent standards, the allegedly inflammatory material cited by defendants Bracco, Martelli, and Muli should not be stricken because it concerns relevant and admissible evidence. Defendants' motions are therefore denied.

■ Defendants Bracco and Martelli and defendant Muli seek to strike all allegations in count 1 establishing their alleged association with the Bonanno organized crime family because they are "smear allegations devoid of any definition or specification" and are "intended to inflame prejudice against defendants." They do not provide a list of all the phrases to which they object but merely cite particular examples of supposedly inflammatory language in count 1: (1) allegations that defendants are "associates of the Bonanno Crime Family" in, e.g., paragraphs 4(f) and 4(g), (2) references to the "Mafia," and (3) "La Cosa Nostra" in paragraph 1(a). Even assuming that defendants are correct in their assessment of the degree of prejudice inherent in such language, their argument fails because the language refers to relevant and admissible evidence. The Government is prosecuting defendants under the RICO statute for unlawfully associating as an "enterprise" to commit illegal activities. Reference to "the Bonanno Crime Family," the "Mafia," and "La Cosa Nostra" serve to identify the "enterprise" under 18 U.S.C. § 1961(4) and thus directly relate to the charge. As the court noted in *United States v. Napolitano*, 552 F.Supp. 465, 480 (S.D.N.Y.1982), where an identical motion to strike was denied, "[t]he Government is entitled to prove that 'the Bonanno Family of La Cosa Nostra,' the enterprise it has described, exists and that defendants are associated with it."[13]

---

13. This aspect of the present prosecution distinguishes this case from *United States v. Dickens*, 775 F.2d 1056, 1058 (9th Cir.1985), which defendant cites for the holding that the defendant's "association with a group engaged in criminal conduct is not itself a crime, and is, standing alone, not admissible for credibility impeachment purposes under Fed.R.Evid. 609." In that case defendant was on trial for drug conspiracy and possession, and his association with a person named Mitchell, who was connected with "the mob," was not relevant to the prosecution's case. In the present case, however, the allegations of association to organized crime relate directly to the gravamen of the RICO offense, which is the formation or participation in an enterprise to carry on racketeering activity, *see* 18 U.S.C. § 1962(d), and thus they are relevant and admissible. *See United States v. Napolitano*, 552 F.Supp. 465, 480 (S.D.N.Y. 1982).

██ Similarly, Muli's claim that words such as "capo" and "underboss" or "boss" must fail because "[t]hese words are explanatory and tend to clarify the structure of the 'enterprise' and the role each defendant allegedly held within the association." *Id.* A similar argument justifies the inclusion of defendants' nicknames, and thus they also survive the motion to strike.

██ Defendant Muli's challenge to count 61's incorporation by reference of paragraphs 1(b), 4(f), and 4(g) of count 1 must also fail because these portions of the indictment also constitute admissible and relevant evidence. Count 61 charges Muli with conspiracy with defendants Bracco and Martelli and the apparently deceased alleged co-conspirator Scordato to defraud the National Labor Relations Board, to receive and pay labor payoffs, and to commit mail fraud. The first paragraph of the count states that "[p]aragraphs 1(b) and 4(f) and (g) of Count One ... are hereby realleged...." Muli objects to the reference to these paragraphs as a "prejudicial form of 'bootstrapping' by which it is attempting to place before the jury a specie of other crimes ... with which defendant Muli is not charged." Such prejudicial material, defendant argues, is inadmissible under the prejudice standard of Rule 404(b) and should be stricken.

Defendant's characterization of these incorporated paragraphs, however, is misleading. None of them refers to the predicate criminal acts constituting the racketeering activity alleged in count 1. Rather, paragraph 1(b) merely describes the economic jurisdiction of Teamsters Local 814, and paragraphs 4(f) and (g) identify the roles that Bracco and Martelli played in Local 814. These allegations serve to identify the actors in the conspiracy alleged in count 61 and the labor organization involved in the bribery. They, therefore, relate directly to the substance of count 61 and constitute relevant admissible evidence. Defendant's motion to strike the references in these paragraphs is, accordingly, denied.

## DISCLOSURE OF GRAND JURY MINUTES

Defendants Agar, Cantatore, and Goldstein move pursuant to Fed.R.Crim.P. 6(e)(3)(C) for disclosure of grand jury minutes or, in the alternative, *in camera* inspection of the minutes by the Court. Because defendants have failed to make a sufficiently compelling showing of particularized need for such disclosure or inspection, their motions are denied.

Defendant Goldstein, indicted for conspiracy to extort property from Steven's Appliances and for receiving labor payoffs (counts 50 and 51), contends that his attorney's own investigation reveals that the Government relied on unreliable information in indicting him in this case. Goldstein is a union official of Local 517, which represented employees of Steven's Appliances. He contends that he has no connection to Teamsters Local 814 or the Bonanno crime family. Moreover, he asserts, the Government had in its possession evidence that he had nothing to do with any request for money from Steven's Appliances at the time of the grand jury investigation. Thus, he concludes, disclosure is appropriate pursuant to Rule 6(e)(3)(C)(ii), which permits disclosure "upon a showing that grounds may exist for a motion to dismiss the indictment...."

Defendants Agar and Cantatore similarly rely on Rule 6(e)(3)(C)(ii). They argue that the validity of the grand jury proceedings is thrown into question by the Government's behavior at other points in the investigation. First, they point out that the Government's allegedly exclusive reliance on an uncorroborated tip to support a search warrant suggests that the Government also may have relied exclusively on hearsay in its evidence before the grand jury. Second, defendants question whether the Government ever informed the grand jury that a government agent stated in an affidavit that a piano was unlawfully given to Charles Martelli, while the indictment charges Charles Agar with the receipt of the piano payoff. Finally, defendants Agar and Cantatore seek to review the grand

jury minutes in light of the fact that their voices were never intercepted by the Title III surveillance conducted in this case, and their names were only mentioned infrequently.

 Because grand jury proceedings are accorded a heavy presumption of regularity, *United States v. Wilson*, 565 F.Supp. 1416, 1436 (S.D.N.Y.1983), it is difficult for defendants to make a showing of grounds to dismiss the indictment sufficient to overcome the traditional secrecy surrounding grand jury proceedings. *United States v. Mahoney*, 495 F.Supp. 1270, 1273–74 (D.Pa.1980). Such a showing has not been made out here by any of the defendants. Defendant Goldstein merely anticipates the defense he could put on at trial, without raising any clear allegation of prosecutorial misconduct. Defendants Agar and Cantatore merely speculate about the possibility of excessive reliance on hearsay. But speculation cannot substitute for fact to establish a basis for the "extraordinary" relief of disclosure of grand jury minutes. *Wilson, supra* at 1436. Thus, defendants' motions for inspection of the grand jury minutes are denied.

## DISCLOSURE OF AGENT'S NOTES

Pursuant to Muli's motion, the Government has consented to an *in camera* review of the handwritten notes that formed the basis for the FBI 302 report of Agent David Stone's interview of Muli. After such inspection, the Court determines that they do not contain any exculpatory *Brady* material, and, therefore, no portion is discoverable by defendant.

## CONCLUSION

For the above reasons, defendants' motions to dismiss, to sever, to suppress, to strike surplusage and to disclose grand jury minutes and agent's notes are, in all respects, denied. Defendants' evidentiary motions are denied without prejudice to renewal at the time of trial. The Government is directed to furnish a bill of particulars regarding the venue issue.

The Clerk is directed to mail a copy of the within to all parties.

SO ORDERED.